*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0340p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

RICHARD ORTEGA,

    *Plaintiff-Appellant,*

  *v.*

        No. 12-6608

UNITED STATES IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,

    *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:11-cv-00429—John G. Heyburn II, District Judge.

Argued: October 8, 2013

Decided and Filed: December 10, 2013

Before: KEITH and SUTTON, Circuit Judges; BLACK, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Brittany Sadler, WILLIAM & MARY LAW SCHOOL, Williamsburg, Virginia, for Appellant. J. Max Weintraub, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Stephen P. Durham, JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville, Kentucky, for Louisville/Jefferson County Appellees. **ON BRIEF:** Tillman J. Breckenridge, REED SMITH LLP, Washington, D.C., for Appellant. J. Max Weintraub, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Stephen P. Durham, JEFFERSON COUNTY ATTORNEY'S OFFICE, Louisville, Kentucky, for Louisville/Jefferson County Appellees.

  SUTTON, J., delivered the opinion of the court, in which BLACK, D. J., joined. KEITH, J. (pp. 10–13), delivered a separate dissenting opinion.

_____

[*] The Honorable Timothy S. Black, United States District Judge for the Southern District of Ohio, sitting by designation.

1

––––––––––––––––––

**OPINION**

––––––––––––––––––

SUTTON, Circuit Judge.   The United States Immigration and Customs Enforcement agency mistakenly issued a detainer for Richard Ortega.  Sent to the Louisville Metro Department of Corrections, the detainer informed the local prison authorities that the immigration agency was investigating whether Ortega, then serving a home-confinement sentence, could be removed from the United States.  Based on the detainer, the department moved Ortega to a local prison.  Ortega, who happened to be a United States citizen, sued, claiming due process and unreasonable seizure violations.  The defendants moved to dismiss on qualified immunity grounds, and the district court granted the motions.  We affirm.

I.

Ortega began serving an eleven-day sentence of home confinement for driving under the influence on March 18, 2011.  Under the terms of his sentence, he had to wear an electronic monitoring device at all times.  With prior approval, he could go to work, the doctor and church.  Otherwise he had to stay at home.

Soon after he began serving the sentence, the corrections department received a detainer for Ortega from federal immigration authorities.  "A detainer is a request filed . . . with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent."  *Carchman v. Nash*, 473 U.S. 716, 719 (1985).  In the normal course, the immigration agency receives notice of state and federal criminal convictions, after which it investigates to determine whether the individual entered the country legally.  If the individual has violated the immigration laws, the agency usually begins removal proceedings.

Immigration agent John Cloyd issued Ortega's detainer after seeing his DUI conviction and after noticing that Ortega's name and birth date resembled, though they did not exactly match, those of an unlawful alien. The detainer informed the corrections department that the immigration agency was investigating whether Ortega entered the country legally.

As a matter of policy, the local corrections department incarcerates any individual with an immigration detainer. On March 19, officers Lori Eppler and William Skaggs took Ortega to the local jail, where he remained until his release on March 22. The corrections department did not conduct its own investigation of Ortega's citizenship before taking him to jail. This Richard Ortega, as it turns out, is a United States citizen, subject to Kentucky's drinking-and-driving laws but not subject to deportation under federal law.

Ortega filed this lawsuit, raising a host of constitutional claims under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). Only two remain. Ortega claims that the city's officers (Eppler and Skaggs) violated his rights against deprivations of liberty without due process and against unreasonable seizures when they carried out the federal detainer and that the federal immigration agent (Cloyd) caused those violations by issuing the detainer. The district court dismissed both sets of claims on qualified immunity grounds.

(On appeal, Ortega occasionally references other defendants and claims mentioned in his complaint. As the defendants point out, Ortega has forfeited these theories of relief because he did not develop them. *See United States v. Sandridge*, 385 F.3d 1032, 1035–36 (6th Cir. 2004).)

II.

Ortega's appeal implicates two old qualified immunity questions: (1) Did the state and federal officials violate Ortega's constitutional rights? (2) If so, were those

rights clearly established at the time of the transfer? *See Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).

Ortega's appeal also implicates two new constitutional law questions: (1) Does an individual serving a sentence through home confinement have a liberty interest protected by the Due Process Clause in not being moved to a traditional prison setting? (2) Does that same individual have a right protected by the Fourth Amendment in not being moved to a traditional prison setting in the absence of probable cause?

Before turning to these questions, it may help to explain how detainers traditionally work and why in the normal course they do not violate these constitutional guarantees. Faced with limited resources, federal immigration authorities understandably pay attention to illegal immigrants who break *other* laws. *See, e.g.*, U.S. Gov't Accountability Office, GAO-12-708, Secure Communities 6–13 (2012). Using a computer database, they determine whether individuals convicted of violating other local, state and federal laws have entered the country illegally. If so, they issue a detainer to the law enforcement authority holding the individual, asking the institution to keep custody of the prisoner for the agency or to let the agency know when the prisoner is about to be released. *See* 8 C.F.R. § 287.7.

Federal detainers do not raise constitutional problems in the normal course. If a local prison keeps tabs on someone until his release, even if it moves him from one prison setting to another, it is difficult to see how that continued custody is any business of the Due Process Clause or for that matter the Fourth Amendment. *See Sandin v. Conner*, 515 U.S. 472 (1995). The same is true if the local prison merely notifies federal immigration authorities before the inmate's release to allow them to take custody over him at the end of his prison sentence in order to begin removal proceedings.

What happens, however, in other settings? Say a State authorizes the arrest of any person, in custody or not, subject to a federal immigration detainer. *See Buquer v. City of Indianapolis*, No. 1:11-cv-708-SEB, 2013 WL 1332158 (S.D. Ind. Mar. 28, 2013). Or say a State refuses to release a person who has posted bail because of an

immigration detainer.  *See Galarza v. Szalczyk*, No. 10-cv-6815, 2012 WL 1080020 (E.D. Pa. Mar. 30, 2012).  Or say a State keeps a person serving a sentence of weekend confinement in jail because of an immigration detainer.  *See Rodriguez v. Aitken*, No. 13-551-SC, 2013 WL 3337766 (N.D. Cal. July 1, 2013).  Or say, as in our case, the individual is on home confinement, and the local officials move him to a traditional prison setting based on the federal detainer.  In these other settings, including most pertinently ours, the matter is more complicated.

*Due Process*.  When an individual violates a criminal law and receives a sentence, he usually cannot be heard to complain about the deprivations of liberty that result.  Although "prisoners do not shed all constitutional rights at the prison gate, . . . lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Sandin*, 515 U.S. at 485.  That is why, when prison authorities move an inmate from one cell to another, even to a cell with far fewer privileges, the increased deprivation generally does not implicate a protected liberty interest under the Due Process Clause.  "The Constitution does not . . . guarantee that the convicted prisoner will be placed in any particular prison." *Meacham v. Fano*, 427 U.S. 215, 224 (1976).  And the Constitution does not prevent a prison transfer to a more restrictive setting unless the change would work an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484.

While this line of authority works against Ortega's claim, it does not defeat it.  A transfer from home confinement to prison confinement, it seems to us, amounts to a sufficiently severe change in conditions to implicate due process.  Yes, both settings involve *confinement*, a reality confirmed by the fact that Ortega must wear an electronic-monitoring device at all times, by the fact that he must obtain permission to leave the home and may do so only for discrete reasons and by the fact he would be prosecuted for escape if he did not comply.  Ky. Rev. Stat. § 532.200(2).  But the two settings of confinement still amount to significant differences in kind, not degree.  A prison cot is not the same as a bed, a cell not the same as a home, from every vantage point:  privacy,

companionship, comfort. And the privileges available in each are worlds apart—from eating prison food in a cell to eating one's own food at home, from working in a prison job to working in one's current job, from attending religious services in the prison to attending one's own church, from watching television with other inmates in a common area to watching television with one's family and friends at home, from visiting a prison doctor to visiting one's own doctor. *See* Ky. Rev. Stat. § 532.200(1). These marked disparities between individual liberty in the one setting as opposed to the other suffice to trigger due process.

What process is due will vary from setting to setting and may well turn on the notice given to the individual before he was allowed to serve a prison sentence at home. Happily for us, we need not answer these more difficult questions today. In a qualified-immunity case, a court may reject the constitutional claim on either of two grounds—either because no such constitutional right existed or because the constitutional right was not clearly established at the time of the incident. As the Supreme Court has acknowledged, lower courts are free to resolve (and it is often more efficient to resolve) qualified-immunity cases based on the second prong—that the contours of the constitutional right were not clearly established at the time. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Just so here.

A clearly established constitutional violation requires on-point, controlling authority or a "robust consensus of cases of persuasive authority." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011) (quotation omitted). As of March 2011, no controlling authority or consensus of persuasive authority established that Ortega had a liberty interest in remaining on home confinement.

The relevant Supreme Court precedent at the time dealt only with traditional confinement and probation or parole. *See Young v. Harper*, 520 U.S. 143, 147–53 (1997); *Sandin*, *supra*; *Gagnon v. Scarpelli*, 411 U.S. 778, 781–82 (1973)*; Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). Ortega's case falls somewhere between traditional confinement and probation/parole, and the Supreme Court has not addressed such a case.

The Sixth Circuit has not addressed an in-between case like Ortega's either.  The closest case, *Ganem v. U.S. Immigration and Naturalization Serv.,* 825 F.2d 410 (6th Cir. 1987) (per curiam) (unpublished), hurts rather than helps Ortega's cause.  It involved a federal prisoner whose prison classification changed because of an immigration detainer.  The court held that a "detainer which adversely affects a prisoner's classification and eligibility for rehabilitative programs does not activate a due process right."  *Id.* at 410.  Even then, *Ganem* does not speak to the question here—whether a home confinee should be thought of as a prisoner without a liberty interest in avoiding a transfer to prison or as a probationer/parolee with such a liberty interest.

In the absence of Supreme Court or Sixth Circuit authority, Ortega points to three cases as evidence of a "robust consensus" of persuasive authority establishing a liberty interest in home confinement.  In one, a probationer challenged the revocation of his probation, the first six months of which were to be served on home confinement.  *Paige v. Hudson*, 341 F.3d 642 (7th Cir. 2003).  The Seventh Circuit (in dicta) stated that the probationer had a constitutionally protected liberty interest in remaining on home confinement.  *Id.* at 643–44.  In another, the same court dealt with the imprisonment of a person serving a sentence that included a short time in jail followed by home confinement.  *See Domka v. Portage Cnty.*, 523 F.3d 776 (7th Cir. 2008).  There the court stated (again in dicta) that *Paige* was not "necessarily controlling" because "Domka was not a probationer but instead a prisoner serving his time outside the jail." *Id.*  In the third case, a group of prisoners released into home confinement challenged their reimprisonment.  *Gonzalez-Fuentes v. Molina*, 607 F.3d 864 (1st Cir. 2010).  The First Circuit concluded (here too in dicta) that home confinement sufficiently resembles probation and parole to create a protected liberty interest in remaining on home confinement.  *Id.* at 890.

These three cases are neither robust in their relevant analyses nor evidence of an on-point consensus.  The decisions from both circuits undermine the central premise of Ortega's claims by noting that today's question—whether initial home confinement

gives rise to a protected liberty interest—is an open one. *See Gonzalez-Fuentes*, 607 F.3d at 887 ("How the Due Process Clause should apply to the liberty interests of prisoners serving sentences in alternative forms of confinement remains an open question."); *Domka*, 523 F.3d at 781 (describing the "law in a case such as this, where the convict is not technically 'imprisoned,' [as] still evolving"). True, both courts concluded that a person released from prison into home confinement has a protected liberty interest in remaining on home confinement. But Ortega's case is different, since he can "appropriately be characterized as a prisoner serving a portion of his confinement in a different location from prison." *Domka*, 523 F.3d at 781 & n.3. That difference explains why the Seventh Circuit suggested that someone in Ortega's position might not have a protected liberty interest in remaining on home confinement. *See id.* The officers could have reasonably thought the same thing, meaning their actions at worst reflected a "reasonable but mistaken judgment[] about [an] open legal question[]." *Al-Kidd*, 131 S. Ct. at 2085. The point of qualified immunity is to protect just such judgments.

*Fourth Amendment.* A similar problem undermines Ortega's Fourth Amendment claim—namely, no relevant authority existed at the time of the incident. A Fourth Amendment seizure requires "a governmental termination of freedom of movement through means intentionally applied." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989). As of March 2011, no controlling authority established that moving a convict from home confinement to prison confinement resulted in a new seizure within the meaning of the Fourth Amendment.

The few cases to discuss seizure claims by those already confined suggest that the "freedom of movement" and "protected liberty interest" inquiries overlap. *See Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000) ("[B]ecause Plaintiff had no protected liberty interest in not being confined in the SHU, he fails to state a Fourth Amendment claim."); *Leslie v. Doyle*, 125 F.3d 1132, 1135–36 (7th Cir. 1997) ("We see no reason . . . why a prisoner's liberty interest under [the Search and Seizure and Due Process Clauses] would differ."). The open question raised by Ortega's due process claim thus spills over into this claim: Should a home confinee be thought of as a

prisoner without freedom of movement or as a probationer/parolee with freedom of movement?

This open question requires a conclusion that "the contours of [a home confinee's right against unreasonable seizures was not] sufficiently clear that a reasonable official would understand that [a transfer from home confinement to jail] violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The individual defendants reasonably could have thought that transferring Ortega to jail would not terminate his "freedom of movement" within the meaning of the Fourth Amendment because home confinement serves as an off-the-premises jail. Just as qualified immunity applies to Ortega's due process claim, it thus also applies to his illegal-seizure claim.

The dissent agrees with our first assessment (that, for purposes of due process and unreasonable seizure protections, home confinement differs materially from in-prison confinement) but not with our second (that the right was not clearly established at the time of the relevant events). Because qualified immunity protects all but "the plainly incompetent," *Malley v. Briggs*, 475 U.S. 335, 341 (1986), because, as the dissent's own cases reveal, no appellate court holdings had addressed this issue at the time of the detainer, and because no material fact disputes cloud these explanations, the district court properly granted qualified immunity to the defendants.

III.

For these reasons, we affirm.

————————

**DISSENT**

————————

DAMON J. KEITH, dissenting.  Because I disagree with the majority's view that Ortega did not have a "clearly established" liberty interest in home confinement, I respectfully dissent.

I address Ortega's claims against the Louisville Metro Department of Corrections ("Metro Defendants") and Immigration agent John Cloyd ("Cloyd") separately.

Metro Defendants

The facts of this case are such that the unlawfulness of Metro Defendants' conduct is readily apparent, even in the absence of clarifying case law.  Metro Defendants seized Ortega, an American-born, United States citizen, from his home and took him to jail for four days, based upon an improper detainer, without a warrant or any semblance of process.  In doing so, Metro Defendants did not allow him to produce any documentation that he was an American citizen.  As this Court has recently explained:

> "[O]utrageous conduct will obviously be unconstitutional" without regard to precedent because "the easiest cases don't even arise." *Safford Unified Sch. Dist. No. 1 v. Redding,* 557 U.S. 364, 377, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009) (brackets and internal quotation marks omitted). And even in cases involving less than outrageous conduct, "officials can still be on notice that their conduct violates established law in novel factual circumstances." *Id.* at 377–78, 129 S.Ct. 2633 (ellipses and internal quotation marks omitted).

*Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 684 (6th Cir. 2013).

Not only should the officers have known that removing someone from their home and taking them to jail requires a certain minimum level of process, but in my view, the relevant case law clearly establishes that criminal defendants have a constitutional due process right to remain in home confinement.

Confinement in the home is inherently different from confinement in jail. The majority concedes this point, holding that the distinction between the two settings of confinement amounts to a "difference[] in kind, not degree." Indeed, the terms of Ortega's plea agreement provided that Ortega would serve his sentence through Kentucky's Home Incarceration Program, a creation of Kentucky law. Under the program, Ortega was allowed to eat foods of his choice, sleep in his own bed, report to work, and attend religious services each day. As the majority correctly points out, "[t]hese marked disparties between the liberty in the one setting as opposed to the other suffice to trigger due process."

Nevertheless, the majority dismisses Ortega's claims based on the second prong of the qualified immunity test, holding that "no controlling authority or consensus of persuasive authority established that Ortega had a liberty interest in remaining on home confinement." This conclusion is untenable. Clearly established rights include not only those specifically adjudicated, but also those that are established by general applications of core constitutional principles. *See, e.g.*, *Quigley*, 707 F.3d at 685 (6th Cir. 2013) ("That there is no federal case directly on point does not undermine [the] conclusion [that] [t]he principle at issue—namely, that a doctor cannot 'consciously expos[e a] patient to an excessive risk of serious harm' while providing medical treatment—is enshrined in our case law.").

Here, the core constitutional principle—that an officer must provide some process before seizing an individual from his home and taking him to jail—is unquestionably enshrined in our case law. Admittedly, the Supreme Court and this Court have only explained this principle in the probation and parole contexts. *See, e.g.*, *Young v. Harper*, 520 U.S. 143, 147-53 (1997); *Sneed v. Donahue*, 993 F.2d 1239, 1241 (6th Cir. 1993). Surely, however, the test for determining whether a constitutional right was clearly established does not require a plaintiff to demonstrate that "the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S.

635 (1987). Indeed, in this case, the unlawfulness of Metro Defendants' actions clearly was apparent.

The majority's cursory dismissal of analogous cases from the First and Seventh Circuits, *see Gonzales-Fuentes v. Molina*, 607 F.3d 864 (1st Cir. 2010); *Domka v. Portage Cnty.*, 523 F.3d 776 (7th Cir. 2008); and *Paige v. Hudson*, 341 F.3d 642 (7th Cir. 2003), as "neither robust in their relevant analyses nor evidence of an on-point consensus" misses the point. At a minimum, those decisions firmly establish that an individual serving a sentence outside of prison is entitled to some minimum amount of process before being arrested and taken to jail. *See also Kim v. Hurston*, 182 F.3d 113, 118-20 (2d Cir. 1999); *Edwards v. Lockhart*, 908 F.2d 299, 302 (8th Cir. 1990).[1]

The majority's holding allows an officer to blatantly violate the Fourth, Fifth, and Fourteenth Amendment rights of an American citizen—so long as it was done in a manner that neither this Court nor the Supreme Court has directly opined on before—with impunity. This cannot be the intent of the qualified immunity doctrine.

ICE Defendant Cloyd

Although the majority fails to distinguish between Ortega's claims against Metro Defendants and ICE Agent Cloyd, the facts of this case call for a separate analysis as to each Defendant's liability.

It is undisputed that Cloyd improperly issued a detainer against Ortega. It is also undisputed that Cloyd's actions were a proximate and but-for cause of Ortega's removal from home confinement and subsequent incarceration. Having established that Ortega had a clearly established liberty interest in remaining in home confinement, Cloyd may be liable for violating Ortega's rights. *See Powers v. Hamilton Cnty. Public Defender*

---

[1]We note further that in 2011, the Eastern District of Pennsylvania evaluated the above-cited cases and decided the precise question in this case in the affirmative, holding that "the Fourteenth Amendment demands some minimal process before a state actor takes someone who is set to serve his sentence at home, on electronic monitoring, and instead puts him in prison or another form of 'institutional confinement.'" *McBride v. Cahoone*, 820 F. Supp. 2d 623, 631 (E.D. Pa. 2011).

*Com'n*, 501 F.3d 592, 608 (6th Cir. 2007). Accordingly, I believe the district court's dismissal of Ortega's claims against Cloyd was improper.

A complaint may only be dismissed "if it is clear that no violation of a clearly established constitutional right could be found under any set of facts that could be proven consistent with the allegations or pleadings." *Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005). In reviewing a motion to dismiss, we "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Ortega alleges that Cloyd improperly issued an immigration detainer against him, despite the fact that he was an American-born United States citizen. Cloyd argues that this erroneous issuance of the detainer was due to the fact that Ortega had a similar, but not identical name and birth date as an individual who had previously been deported. The district court referred to this as "an unfortunate but honest mistake." R. 48 at 343. But the district court could not possibly have assessed the reasonableness of Cloyd's error because the detainer was not part of the record at the motion to dismiss stage. There is simply no way to know how similar the names and birth dates of the two individuals were without analyzing the detainer itself.

Moreover, even taking Cloyd's argument on its face, it is unclear what relationship—beyond a shared ethnic background—Ortega had with an individual who had already been removed from the country. To allow ICE to issue a detainer against an American citizen, with unlimited discretion and without any accountability, sets a dangerous precedent and offends any and all notions of due process. Because a reasonable factfinder could conclude, after carefully evaluating the detainer, that Cloyd intentionally and improperly issued the detainer against Ortega, I believe dismissal was improper.

For the foregoing reasons, I do not agree that the claims against either of the defendants should have been dismissed. I dissent.