**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3991
_____

ERNESTO GALARZA,

Appellant

v.

MARK SZALCZYK; CITY OF ALLENTOWN;
LEHIGH COUNTY; GREG MARINO;
CHRISTIE CORREA


_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Civil Action No. 10-cv-6815)
District Judge: Hon. James Knoll Gardner
_____

Argued: October 10, 2013

Before: FUENTES, COWEN, and BARRY, *Circuit Judges*.

(Opinion Filed: March 4, 2014)

1

Mary Catherine Roper, Esq.
Molly M. Tack-Hooper, Esq.
American Civil Liberty Union Foundation of Pennsylvania
P.O. Box 40008
Philadelphia, PA 19106

Omar C. Jadwat, Esq.
Esha Bhandari, Esq.
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004

Jonathon H. Feinberg, Esq.
Kairy, Rudovsky, Messing & Feinberg LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19106

Cecilia Wang, Esq.
Katherine Desormeau, Esq. **[ARGUED]**
American Civil Liberties Union Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111

Seith Kreimer, Esq.
3400 Chestnut Street
Philadelphia, PA 19104

*Attorneys for Appellant Ernesto Galarza*

2

Thomas M. Caffrey, Esq. **[ARGUED]**
532 Walnut Street
Allentown, PA 18101

*Attorney for Appellee Lehigh County*

Christopher N. Lasch, Esq.
University of Denver Envirorment Center
Environmental Law Clinic
2255 East Evans Avenue
Suite 335
Denver, CO  80298

Rebecca A. Sharpless, Esq.
University of Miami School of Law
E257
1311 Miller Drive
Coral Gables, FL  33146

*Attorneys for Amicus Appellant Law Professors and Scholars
who Teach, Research, and Practice in the Area of
Immigration and Nationality Law and Criminal Law*

Andrew C. Nichols, Esq.
Winston & Strawn
1700 K Street, N.W.
Washington, DC  2006

*Attorney for Amicus Appellant National Immigration Project
of  the National Lawyers Guild*

_____

OPINION OF THE COURT
_____

3

FUENTES, *Circuit Judge.*

Ernesto Galarza is a U.S. citizen who was arrested for a drug offense, posted bail, and instead of being released, was held in custody by Lehigh County under an immigration detainer issued by federal immigration officials. Three days after Galarza posted bail, immigration officials learned that he was a U.S. citizen. The detainer was withdrawn and Galarza was released. Galarza then filed this § 1983 action against, in relevant part, Lehigh County, contending that Lehigh County detained Galarza without probable cause for more than 48 hours, without notice of the basis of his detention or the ability to contest it. The District Court dismissed the complaint against Lehigh County on the basis that it could not be held responsible for Galarza's detention because it was compelled to follow the immigration detainer. On appeal, Galarza argues that under a plain reading of the relevant federal regulation, immigration detainers are permissive and, to hold otherwise, would violate the anti-comandeering principles inherent in the Tenth Amendment. We agree with Galarza that immigration detainers do not and cannot compel a state or local law enforcement agency to detain suspected aliens subject to removal. Accordingly, we vacate and remand for further proceedings.

## I. <u>BACKGROUND</u>[1]

This case arises out of Ernesto Galarza's detention by the Allentown Police Department and the Lehigh County Prison in November 2008. Galarza is a U.S. Citizen, born in Perth Amboy, New Jersey. He is a Hispanic man of Puerto Rican heritage. On November 20, 2008, Galarza was performing construction work on a house in Allentown, Pennsylvania. Sometime that day, the contractor on the construction site sold cocaine to an undercover Allentown Police detective, Christie Correa. Detective Correa arrested the contractor, along with Galarza and two other employees who were working at the site. All were charged with conspiracy to deliver cocaine in violation of Pennsylvania law. Two of the other workers arrested were citizens of the Dominican Republic, and the third was a citizen of Honduras. At the time of Galarza's arrest, he had a wallet, which contained his Pennsylvania driver's license, his Social Security Card, a debit card, and his health insurance card. After his arrest, Galarza was detained by the Allentown Police Department. The Criminal Complaint prepared by Correa at the time of Galarza's arrest listed Galarza's place of birth as Perth Amboy, N.J. and contained Galarza's Social Security Number and date of birth. In accordance with

---

[1] The District Court had federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1291. Because we are reviewing the appeal of a grant of a motion to dismiss under Rule 12(b)(6), our review is plenary. *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163 (3d Cir. 2010). For the same reason, we state the facts in the amended complaint in the light most favorable to the non-moving party below, Galarza. *See Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 523 (3d Cir. 2009).

Allentown's policy to contact Immigration and Customs Enforcement ("ICE")[2] whenever persons arrested are suspected of being "aliens subject to deportation," Correa called ICE and provided immigration officials with Galarza's name, date and place of birth, ethnicity, and Social Security number. Galarza contends that, by making this call, Correa gave ICE reason to believe that she suspected Galarza had given false information about his identity.

That evening, Galarza was transported to Lehigh County Prison and his bail was set at $15,000. The following morning, Friday, November 21, Galarza went through the booking process, and during this process, he told prison officials that he was born in New Jersey. The officials took his wallet, containing his driver's license, Social Security Card, debit card, and health insurance card.

At some point that day, ICE Agent Mark Szalczyk, acting on the information relayed by Correa, filed an immigration detainer with Lehigh County Prison. The detainer described Galarza as a suspected "alien" and citizen of the Dominican Republic. The detainer read:

> Investigation has been initiated to determine whether this person is subject to removal/deportation from the United States. . . .

---

[2] ICE is the investigative arm of the Department of Homeland Security ("DHS"). DHS assumed the responsibilities of the former Immigration and Naturilization Service ("INS") in 2002. *See* Homeland Security Act of 2002, 6 U.S.C. § 101 *et seq.*

6

It is requested that you: Please accept this notice as a detainer. This is for notification purposes only. . . . Federal regulations (8 CFR 287.7) require that you detain the alien for a period not to exceed 48 hours (excluding Saturdays, Sundays and Federal holidays) to provide adequate time for ICE to assume custody of the alien. You may notify ICE by calling (610) 374-0743 during business hours or 802 872-6020 after hours in an emergency.

App. at 105. The detainer was accompanied by neither a warrant, an affidavit of probable cause, nor a removal order. That same day, a surety company posted bail for Galarza, and a Lehigh County Prison official told Galarza that he would be released. Shortly thereafter, the same official informed Galarza that he would not be released because he was the subject of a detainer.

When Galarza protested that there should be no detainer preventing his release, the official told Galarza that he would have to wait through the weekend until Monday, November 24 to speak with a counselor. Galarza had not been interviewed by ICE or provided with a copy of the detainer. It was not until that Monday, three days after his arrest, that a Lehigh County Prison counselor told Galarza for the first time that the detainer holding him was an immigration detainer filed by ICE. Galarza immediately protested that he was a U.S. Citizen, and he urged the counselor to retrieve his wallet from the property room in order to look at Galarza's driver's license and Social Security Card, but the counselor refused. Shortly thereafter, Galarza met with two ICE officers, who questioned him extensively about his statement that he was born in New Jersey. Galarza gave the immigration officials his Social Security Number and date of birth. The officials left and returned to inform Galarza that the detainer was

being lifted. The detainer was in fact removed at 2:05 pm on Monday, November 24. Lehigh County did not release him until more than six hours later, at about 8:30 pm. Galarza was eventually acquitted by a jury of the charge stemming from his November 20, 2008 arrest.

Galarza filed two complaints: the first against Lehigh County, the City of Allentown, and various individual federal and municipal defendants for violations of his constitutional rights, and the second against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). These cases were consolidated. All defendants in the consolidated case, except the United States, moved to dismiss under Rule 12(b)(6). *Galarza v Szalczyk*, 2012 WL 1080020, at \*1 (E.D. Pa. Mar. 30, 2012). The District Court held that the claims against ICE Agent Szalczyk and Allentown Detective Correa, for violations of the Fourth Amendment and the Equal Protection Clause, could go forward and that these officials were not entitled to qualified immunity. *Id*. at \*2. The District Court dismissed a procedural due process claim against ICE Agent Szalczyk on qualified immunity grounds and dismissed all claims against another ICE official, the City of Allentown, and Lehigh County. *Id*.

In relevant part, the District Court determined that Galarza's continued detention after he posted bail constituted a seizure within the Fourth Amendment and that the seizure was unsupported by probable cause. *Id*. at \*9-14. Specifically, the District Court found that Galarza had stated a Fourth Amendment claim against Correa and Szalczyk because these officers lacked probable cause to issue an immigration detainer. The District Court reasoned: "[t]he fact that Mr. Galarza is Hispanic and was working at a construction site with three other Hispanic men—two of whom are citizens of foreign countries and another who claimed to have been born in Puerto Rico but is a citizen of the Dominican Republic—

8

does not amount to probable cause to believe that Mr. Galarza is an alien not lawfully present in the United States." *Id.* at *14. It also denied these officers' motions to dismiss these claims on grounds of qualified immunity. *Id.* at *14-15.

However, the District Court dismissed the Fourth Amendment and procedural due process claims against Lehigh County on the ground that "neither of the policies identified in plaintiff's Amended Complaint is unconstitutional [because] both are consistent with federal statutes and regulations." *Id.* at *18. In doing so, the District Court relied on 8 C.F.R. § 287.7, concluding that detainers issued pursuant to this regulation impose mandatory obligations on state or local law enforcement agencies ("LEA"s), including municipalities, to follow such a detainer once it is received. *Id.* at *19. The District Court also dismissed Galarza's procedural due process claim on the ground that Lehigh County complied with the federal regulation setting the time limits on detention because it did not hold Galarza for more than 48 hours, not including weekends. *Id.* The Court then dismissed the procedural due process claim against Szalczyk on grounds of the qualified immunity doctrine, noting that "even if the period of detention specified by the regulation were found to be unconstitutional, it would not be clear to every reasonable officer that the detention for a period expressly provided by federal regulation was unlawful." *Id.* at *18.

Following the issuance of the District Court opinion, Galarza reached a settlement with the remaining individual defendants, the City of Allentown, and the United States, resulting in a final order dismissing the case as to all defendants. Galarza appeals only the dismissal of his complaint against Lehigh County.

9

## II. DISCUSSION

Galarza's claims against Lehigh County arise under 42 U.S.C. § 1983. To establish municipal liability under § 1983, Galarza must plead two elements: first, that he was deprived of rights, privileges, or immunities secured by the Constitution and laws, and, second that the deprivation of those rights was caused by an official government policy or custom. *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 (3d Cir. 2013). Regarding his Fourth Amendment rights, Galarza contends that his detention resulted from Lehigh County's stated policy and practice of enforcing all immigration detainers received from ICE, regardless of whether ICE had, or even claimed to have, probable cause to detain the suspected immigration violator. To support his claim, Galarza contends that: (1) when a Lehigh County Prison counselor first told Galarza that he had been held on an immigration detainer, the official refused to look into Galarza's stated proof that he was a U.S. Citizen, instead waiting for ICE officers to arrive; (2) Lehigh County Prison honored the ICE detainer in this case on less than probable cause; and (3) ICE has a history of issuing and then cancelling improper ICE detainers lodged against inmates at the Lehigh County Prison. Regarding his procedural due process claim, Galarza contends that, under Lehigh County's policies, he was held for three days without any notice of the basis for his detention or a meaningful opportunity to explain that he was a U.S. Citizen, despite his repeated requests to contest his detention.

At oral argument, counsel for Lehigh County conceded that the policies as alleged would be unconstitutional, and that Lehigh County's sole basis for seeking dismissal of Galarza's claims is the allegedly mandatory nature of ICE detainers. In this light, the only question on appeal is whether Galarza has

10

sufficiently pleaded facts to support his claims that Lehigh County's unconstitutional policies or customs caused the deprivations of his Fourth Amendment and procedural due process rights.

### A. Interpretation of 8 C.F.R. § 287.7[3]

The parties' dispute centers on whether immigration detainers issued pursuant to 8 C.F.R. § 287.7 impose mandatory obligations on state and local LEAs to detain suspected aliens subject to removal. The regulation at issues provides, in relevant part, as follows:

---

[3]It is true, as the dissent points out, that neither the U.S. Government or any of its agencies continues to be a party in this appeal. However, as the dissent also recognizes, the U.S. Government, as well as two of its agents, were parties to this case when the District Court articulated the principle that we review here. *See Galarza v. Szalczyk*, 10-cv-6815, Docs. 96 & 99 (July 26, Aug. 22, 2012, E.D. Pa.) (orders dismissing the claims against ICE Agent Scalczyk and the U.S. Government); *Galarza*, 2012 WL 1080020 , at * 22 (dismissing claims against ICE Agent Gregory Marino). In any event, as further explained *supra*, Part II.A., we doubt that the U.S. Government and its immigration agencies would disagree with our interpretation of the regulation. In fact, the Office of Immigration Litigation of the Department of Justice representing Janet Napolitano, then Secretary of the Department of Homeland Security, and other federal officials, admitted in a request for admission in a recent litigation that "ICE has no legal authority to require state o[r] local law enforcement to detain an individual during the 48-hour detention period." Supp. App. at 8 (Apr. 5, 2013); *see Jose Jimenez Moreno v. Janet Napolitano*,11-cv-5452 (N.D. Ill., Nov. 8, 2011) (date of case filing).

(a) Detainers in general. Detainers are issued pursuant to sections 236 and 287 of the Act and this chapter 1. Any authorized immigration officer may at any time issue a Form I–247, Immigration Detainer–Notice of Action, to any other Federal, State, or local law enforcement agency. *A detainer serves to advise* another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. *The detainer is a request* that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible.

. . .

(d) *Temporary detention at Department request*. Upon a determination by the Department to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency *shall maintain custody* of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department.

8 C.F.R. § 287.7(a), (d) (emphasis added). Lehigh County argues that the phrase "shall maintain custody" contained in § 287.7(d) means that detainers issued under § 287.7 are mandatory. Lehigh County acknowledges that § 287.7(d) is titled "Temporary detention at Department request" and that § 287.7(a) provides that "[t]he detainer is a request." However, Lehigh County maintains this language is overshadowed by the use of the word "shall" in § 287.7(d).

12

According to Lehigh County, the word "shall" means that the "request" is not really a request at all, but an order. Meaning, Lehigh County cannot be held responsible for Galarza's three-day detention after he posted bail. Galarza argues that the word "shall" serves only to inform an agency that otherwise decides to comply with an ICE detainer that it should hold the person no longer than 48 hours.

We believe that Galarza's interpretation is correct. The words "shall maintain custody," in the context of the regulation as a whole, appear next to the use of the word "request" throughout the regulation. Given that the title of § 287.7(d) is "Temporary detention at Department request" and that § 287.7(a) generally defines a detainer as a "request," it is hard to read the use of the word "shall" in the timing section to change the nature of the entire regulation. *Cf. Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (observing that a statute's title and a section's heading may be considered in resolving doubt about a provision's meaning).

However, even if we credit that the use of the word "shall" raises some ambiguity as to whether detainers impose mandatory obligations, this ambiguity is clarified on numerous fronts. First, no U.S. Court of Appeals has ever described ICE detainers as anything but requests. Second, no provisions of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, authorize federal officials to command local or state officials to detain suspected aliens subject to removal. Lastly, all federal agencies and departments having an interest in the matter have consistently described such detainers as requests. We will address each of these factors in turn.

First is the case law. All Courts of Appeals to have commented on the character of ICE detainers refer to them as

13

"requests" or as part of an "informal procedure." *See, e.g.*, *Ortega v. U.S. Immigration & Customs Enforcement*, 737 F.3d 435, 438 (6th Cir. Dec. 10, 2013) (noting that federal immigration officials issue detainers to local LEAs "asking the institution to keep custody of the prisoner for the [federal immigration] agency or to let the agency know when the prisoner is about to be released"); *Liranzo v. United States*, 690 F.3d 78, 82 (2d Cir. 2012) (noting that "ICE issued an immigration detainer to [jail] officials requesting that they release Liranzo only into ICE's custody" so that he could be removed from the United States); *United States v. Uribe-Rios*, 558 F.3d 347, 350 n.1 (4th Cir. 2009) (defining detainers as a "request that another law enforcement agency temporarily detain an alien" to permit immigration officials to assume custody (citing 8 C.F.R. § 287.7)); *United States v. Female Juvenile, A.F.S.*, 377 F.3d 27, 35 (1st Cir. 2004) (noting that a "detainer . . . serves as a request that another law enforcement agency notify the INS before releasing an alien from detention" (citing 8 C.F.R. § 287.7(a))); *Giddings v. Chandler*, 979 F.2d 1104, 1105 n.3 (5th Cir. 1992) (describing the procedure under § 287.7 as "an informal [one] in which the INS informs prison officials that a person is subject to deportation and requests that officials give the INS notice of the person's death, impending release, or transfer to another institution").

Second, Congress's only specific mention of detainers appears in INA § 287, 8 U.S.C. § 1357(d). The Act does not authorize federal officials to command state or local officials to detain suspected aliens subject to removal. Moreover, in reviewing this statute, the Supreme Court has noted that § 1357(d) is a request for notice of a prisoner's release, not a command (or even a request) to LEAs to detain suspects on behalf of the federal government. *Arizona v. United States*, 132 S. Ct. 2492, 2507 (2012) (observing that "[s]tate officials can also assist the Federal Government by responding to

14

requests for information about when an alien will be released from their custody. See § 1357(d).").

Contrary to Lehigh County's assertion, ICE's (and its precursor INS's) policy statements also hold persuasive weight in this context. *See Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 155 (3d Cir. 2004). Since at least 1994, and perhaps as early as 1988, ICE (and its precursor INS) have consistently construed detainers as requests rather than mandatory orders. In 1994, when responding to comments provided in the process of administrative "Notice and Comment" before a "Final Rule" change amending 8 C.F.R. § 287.7, the INS wrote that, "A detainer is the mechanism by which the Service requests that the detaining agency notify the Service of the date, time, or place of release of an alien who has been arrested or convicted under federal, state, or local law." 59 Fed. Reg. 42406, 42407 (Aug. 17, 1994). Moreover, in a 2010 policy memo, ICE describes a detainer as a "request that the LEA maintain custody of an alien who would otherwise be released for a period not to exceed 48 hours."[4] This description is restated on ICE's website under "Frequently Asked Questions" about ICE detainers in response to the specific question "What is an immigration detainer?"[5] In response to a local official's letter asking whether "localities are required to hold individuals

_____

[4] ICE, Interim Policy Number 10074.1: Detainers, ¶ 2.1 (Aug. 2, 2010), *available at*
http://cironline.org/sites/default/files/legacy/files/ICEdetainer policy.PDF (last visited Dec. 13, 2013).
[5] ICE, ICE Detainers: Frequently Asked Questions, http://www.ice.gov/news/library/factsheets/detainer-faqs.htm (last visited Dec. 23, 2013) (noting that an immigration detainer serves, in relevant part, as a "request that the LEA maintain custody of an alien who would otherwise be released for a period not to exceed 48 hours").

pursuant to [ICE detainers]," a senior ICE official responded: "ICE views an immigration detainer as a *request* that a law enforcement agency maintain custody of an alien who may otherwise be released[.]"[6] And in a 2010 briefing to the Congressional Hispanic Caucus, agency representatives told congressional staff that "local [law enforcement] are not mandated to honor a detainer, and in some jurisdictions they do not."[7]

These policy statements are also consistent with ICE's (and previously INS's) litigation position that detainers are requests or notifications. For example, in 1998, the INS argued that a detainer it issued was "not a detainer but merely serve[d] to advise [a] correctional facility that the INS may find [an inmate] excludable and request[ed] that the institution inform the INS of Vargas's expected release." *Vargas v. Swan*, 854 F.2d 1028, 1030 (7th Cir. 1988). Furthermore, the immigration agency there noted "that the face of the detainer states that it is 'for notification purposes only,'" and that it was "nothing more than 'an internal administrative mechanism,' . . . accompanied by neither a warrant of arrest nor by an order to show cause." *Id.*

---

[6] Letter from David Venturella, Secure Communities Assistant Director, ICE, to Miguel Márquez, Santa Clara County Counsel, ¶ 2(a) (Sept. 27, 2010) (emphasis added), *available at* http://www.scribd.com/doc/38550589/ICELetter-Responding-to-SCC-Re-S-Comm-9-28-10 (last visited Dec. 23, 2013).

[7] ICE FOIA 2674.020612, Draft Memorandum to David Venturella, Secure Communities Assistant Director, ICE, "Secure Communities Briefing (Congressional Hispanic Caucus)" at 3 (Oct. 28, 2010), *available at* http://altopolimigra.com/wpcontent/uploads/2011/12/ICE-FOIA-2674.020612.pdf (last visited Dec. 23, 2013).

To rebut the evidence that detainers are not mandatory or commands to other LEAs, Lehigh County suggests that these statements are contradicted by the language of the detainer form that was issued in Galarza's case. Lehigh County's argument here is similar to the one it made regarding the regulation itself: Because the detainer issued to Lehigh County stated that "Federal regulations (8 CFR 287.7) require that you detain the alien for a period not to exceed 48 hours (excluding Saturdays, Sundays and Federal holidays)," the detainer was mandatory. App. at 105. Again, Lehigh County overlooks the first part of the detainer filed with Lehigh County, which read at the time, "It is *requested* that you: Please accept this notice as a detainer. This is for *notification purposes* only." *Id*. (emphasis added).

Lehigh County seeks to bolster its argument by highlighting the fact that the detainer forms were altered in 2010 so that the word "require" does not appear anywhere on the current detainer form. The form now reads: "IT IS REQUESTED THAT YOU: Maintain custody of the subject for a period **NOT TO EXCEED 48 HOURS**."[8] We believe that, on its own, this alteration in the detainer form does not support Lehigh County's conclusion that ICE's position changed—the alteration is also consistent with the view that ICE was merely clarifying its detainer form to reflect its longstanding interpretation of the regulation. In short, the position of federal immigration agencies has remained constant: detainers are not mandatory.[9]

---

[8] DHS, IMMIGRATION DETAINER-NOTICE OF ACTION, *available at* http://www.ice.gov/doclib/secure-communities/pdf/immigration-detainer-form.pdf (last visited Dec. 23, 2013).

[9] To further respond to Lehigh County's argument that these policy statements and litigation positions should not be

### B. Constitutional Concerns

Even if there were any doubt about whether immigration detainers are requests and not mandatory orders to local law enforcement officials, settled constitutional law clearly establishes that they must be deemed requests. When confronted with two plausible interpretations of a statute, one which could require the Court to interpret the regulation as unconstitutional and one which poses no constitutional problem, we are obliged to adopt the latter interpretation, "unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).

Under the Tenth Amendment, immigration officials may not order state and local officials to imprison suspected aliens subject to removal at the request of the federal government. Essentially, the federal government cannot command the government agencies of the states to imprison persons of interest to federal officials.

relevant in our analysis, we note that the particular weight to give to ICE's and INS's policy statements depends on a number of factors. These include "the thoroughness evident in [their] consideration, the validity of [their] reasoning, [their] consistency with earlier and later pronouncements, and all those factors which give [them] power to persuade, if lacking power to control." *Mercy*, 380 F.3d at 155 (internal quotation marks omitted). ICE's and INS's policy statements and litigation positions are probative here because they are internally consistent over a lengthy period of time and align with the most logical reading of the regulation, thus lending further support to our determination that ICE detainers are indeed permissive, not mandatory.

18

As we have previously recognized, "all powers not explicitly conferred to the federal government are reserved to the states, a maxim reflected in the text of the Tenth Amendment." *Nat'l Collegiate Athletic Ass'n ("NCAA") v. Governor of N.J.*, 730 F.3d 208, 227 (3d Cir. 2013). It follows that "any law that commandeers the legislative processes [and agencies] of the States by directly compelling them to enact and enforce a federal regulatory program is beyond the inherent limitations on federal power within our dual system." *Id.* (quoting *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 283 (1981)) (internal quotation marks omitted). In other words, a conclusion that a detainer issued by a federal agency is an order that state and local agencies are compelled to follow, is inconsistent with the anti-commandeering principle of the Tenth Amendment.

On two occasions the Supreme Court has struck down portions of federal laws that compelled states or local state agencies on anti-commandeering grounds. The first case was *New York v. United States*, 505 U.S. 144 (1992), which concerned a federal law to regulate the disposal of radioactive wastes by the states. The most problematic aspect of this complex regulatory scheme was the requirement that a state "take title" to radioactive material, if that state could not arrange for disposal of the hazardous material within a specified date. *Id.* at 153-54. The Supreme Court struck down the "take title" provision based on the idea that "Congress may not simply 'commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *Id.* at 161 (quoting *Hodel*, 452 U.S. at 288) (alterations omitted). As we stated in *NCAA*, the Court concluded that the "take title" provision did, in fact, "compel the states to either enact a regulatory program, or expend resources in taking title to the waste." *NCAA*, 730 F.3d at 229 (citing *New York*, 505 U.S. at 176). The Court

19

also observed that "the anti-commandeering principle was designed, in part, to stop Congress from blurring the line of accountability between federal and state officials and from skirting responsibility for its choices by foisting them on the states." *Id.* (citing *New York*, 505 U.S. at 168).

The Court next applied this anti-comandeering principle in *Printz v. United States*, 521 U.S. 898 (1997), to invalidate provisions of the Brady Handgun Violence Prevention Act that compelled local authorities of certain states to conduct background checks on persons applying to purchase guns. *Printz* is relevant in determining whether federal officials can order local and state LEAs to hold suspected aliens subject to removal in detention on behalf of the federal government. The Court noted that, "[t]he power of the Federal Government would be augmented immeasurably if it were able to impress into its service—and at no cost to itself—the police officers of the 50 States." *Id.* at 922. The Court concluded that Congress "may neither issue directives requiring the States to address particular problems, nor command the States' officers . . . to administer or enforce a federal regulatory program." *Id.* at 935. The Court was clearly concerned that portions of the Brady Act required states to "absorb the financial burden of implementing a federal regulatory program" and "tak[e] the blame for its . . . defects." *Id.* at 930.

In light of these principles, it is clear to us that reading § 287.7 to mean that a federal detainer filed with a state or local LEA is a command to detain an individual on behalf of the federal govenment, would violate the anti-commandeering doctrine of the Tenth Amendment. As in *New York* and *Printz*, immigration officials may not compel state and local agencies to expend funds and resources to effectuate a federal regulatory scheme. The District Court's interpretation of § 287.7 as compelling Lehigh County to detain prisoners for

20

the federal government is contrary to the Federal Constitution and Supreme Court precedents.

There is no meaningful distinction between the Brady Act provisions and the regulation at issue here which would, according to Lehigh County, require state and local governments to spend public funds in order to detain suspects on behalf of the federal government for the 48-hour period. In fact, the federal government has made clear that local LEAs have to foot the bill, providing that "[n]o detainer issued as a result of a determination made under this chapter . . . shall incur any fiscal obligation on the part of the Department." 8 C.F.R. § 287.7(e). Even though, as the Amici Curiae Law Professors explain, the issue of commandeering is not one of degree, "[s]uch direct federal control over state officials far exceeds the regulatory regime *Printz* invalidated." Br. for Law Professors at 14.

Furthermore, the command to detain federal prisoners at state expense is exactly the type of command that has historically disrupted our system of federalism. As Galarza points out, the federal government has made *requests* to states to house federal prisoners since the Founding of the Republic, and such requests represent the quintessential type of cooperation sanctioned by the Framers. The Court in *Printz* relied on this history in developing the contours of the concept of commandeering that must have existed at the time of the Constitution's Framing. *See Printz*, 521 U.S. at 909-10 (discussing the practice of early Congress (1789-91) issuing recommendations to state legislatures to house federal prisoners and noting that when states failed to comply, Congress's reaction was simply "to rent a temporary jail until provision for a permanent one could be made").

Because of this potential constitutional problem, and because Congress has made no mention in the INA that it

intends for DHS to issue mandatory detainers, *see supra* Part II.A., we must read the regulation as authorizing only permissive requests that local LEAs keep suspected aliens subject to deportation in custody. In fact, in recognition of their right to refuse requests under § 287.7, a number of local governments, the District of Columbia, and now the state of California, have established official policies whereby they will only detain suspects pursuant to ICE detainers in situations where the suspect named in an immigration detainer has been convicted of or is charged with a serious crime.[10]

---

[10] *See, e.g.*, Santa Clara County, Cal., Board of Supervisors' Policy Manual § 3.54, Civil Immigration Detainer Requests (resolution adopting § 3.54) (2010), *available at* http://bit.ly/YiQ8y6 ("No County department, agency, officer, or employee shall use any County funds, resources, or personnel to investigate, question, apprehend, or arrest an individual solely for an actual or suspected civil violation of federal immigration law."); Cook County, Ill., Ordinance § 46-37, *available at* http://bit.ly/15SWpFY ("**WHEREAS**, 8 CFR § 287.7 expressly provides that ICE detainers are merely 'requests' that local law enforcement advise DHS when the individual is due to be released, and that the agency continue holding the individual beyond the scheduled time of release for up to 48 hours, excluding weekends and federal holidays, in order for ICE to arrange to assume custody … (a) The Sheriff of Cook County shall decline ICE detainer requests unless there is a written agreement with the federal government by which all costs incurred by Cook County in complying with the ICE detainer shall be reimbursed."); Chicago Municipal Code §§ 2-173-05, 2-173-042 (first adopted 2012), *available at* http://bit.ly/ZQxQFD (declining to honor detainers unless the subject of the investigation has an oustanding criminal warrant, has been convicted of a felony, has a felony charge pending, or has been identified as

Thus, any remaining ambiguity must be resolved in favor of a constitutional reading of the regulation. In this case, that means we must read the regulation as authorizing only requests that state and local law enforcement agencies detain suspected aliens subject to removal.

### III. <u>CONCLUSION</u>

For these reasons, we conclude that 8 C.R.F. § 287.7 does not compel state or local LEAs to detain suspected aliens subject to removal pending release to immigration officials. Section 287.7 merely authorizes the issuance of detainers as requests to local LEAs. Given this, Lehigh County was free to disregard the ICE detainer, and it therefore cannot use as a defense that its own policy did not cause the deprivation of Galarza's constitutional rights. Accordingly, the District Court's judgment dismissing Galarza's complaint against Lehigh County is VACATED

---

a known gang member); N.Y.C., N.Y., Administrative Code § 9-131(first adopted 2012) (same, and adding a condition that a detainer could be honored for a terrorism suspect as well); City of Berkeley, California Council, Regular Meeting Annotated Agenda (Oct. 30, 2012), *available at* http://bit.ly/WOmMfO (similar to N.Y.C. and Chicago policies); D.C. Acts 19-442, Immigration Detainer Compliance Amendment Act of 2012, 59 D.C. Reg. 10153-55 (same); Brent Begin, *San Francisco County Jail Won't Hold Inmates for ICE*, SF EXAMINER (May 6, 2011) (describing policy adopted by San Francisco Sheriff Michael Hennessey to not honor detainers for those arrested for minor crimes). In fact, just recently, California adopted a statute limiting LEAs throughout the entire state from cooperating with ICE detainers. Cal Gov't Code § 7282 *et seq.* (effective Jan. 1, 2014).

and the matter is REVERSED for proceedings consistent with this opinion.

*Galarza v. Lehigh County*, No. 12-3991

BARRY, *Circuit Judge*, dissenting

I am deeply concerned that the United States has not been heard on the seminal issue in this appeal, an issue that goes to the heart of the enforcement of our nation's immigration laws. And make no mistake about it. The conclusion reached by my friends in the Majority that immigration detainers issued pursuant to 8 C.F.R. § 287.7 do not impose any obligation on state and local law enforcement agencies to detain suspected aliens subject to removal, but are merely requests that they do so, has enormous implications and will have, I predict, enormous ramifications.

Maybe the Majority is right when it says that the language that the particular agency "shall maintain custody," § 287.7(d), is *really* only "a request," § 287.7(a). And maybe the Majority is wrong. I'm simply not ready to make that call; indeed, I believe that it is a mistake to do so without the input of the United States, on whom the Opinion will impact most immediately and most profoundly. [1] And even aside from *that* impact will be the impact on state and local law enforcement agencies, not the least of which will be for them to figure out what hoops they will have to jump through to inform their decision as to whether or not to grant a particular "request." Will, for example, they have to determine if, in the first instance, ICE had probable cause to issue the detainer? Will the detainee have a right to be heard? And, pray tell, how and when will they do all of *that*? And that's just for starters.

---

[1] ICE issued 273,982 immigration detainers from October 1, 2011 to September 30, 2012 (Fiscal Year 2012). In the first four months of Fiscal Year 2013, it issued 73,709 detainers, corresponding to an annualized figure of 221,124. *See Number of ICE Detainers Drops by 19 Percent*. Transactional Records Access Clearinghouse at Syracuse Univ. (July 25, 2013), http://trac.syr.edu/immigration/reports/325/. These numbers, I recognize, cover all detainers issued by ICE, and not just those which direct a law enforcement agency to maintain custody over a suspected removable alien.

This was, until now, a comparatively uncomplicated case brought by Mr. Galarza, who, as relevant here, was detained within the brief period of time set forth in § 287.7(d) after bail was posted on his criminal charges. The United States was not a party in this § 1983 action,[2] and the only defendants were Lehigh County, the City of Allentown and one of its detectives, and two ICE agents, named only in their individual capacities. Parenthetically, although the ICE agents were represented by counsel from the Department of Justice, counsel made it abundantly clear to the District Court that she did not represent ICE and represented only her clients. *See*, *e.g.*, Tr. of Dec. 15, 2011 at 48-49. The District Court well understood that fact. *Id.*

The sole appellee in this case is Lehigh County, whose only involvement with reference to the central issue before us on appeal is that Galarza was briefly housed in one of its prisons, and that it, through its prison, complied with the immigration detainer once the detainer kicked in. The County, not surprisingly, argued to the District Court why the "shall maintain custody" language was mandatory—it had, it said, no choice in the matter. Galarza, also not surprisingly, argued that the language was not mandatory, and that the District Court's erroneous conclusion to the contrary was the result of a "misunderstanding of immigration detainers" because of *Lehigh County's* arguments, "not the federal government's." Appellant's Br. at 23, 29. Indeed, Galarza concedes that the United States was not heard as to § 287.7 nor even as to its "own statements" that immigration detainers

---

[2] The United States was named as a defendant in a separate negligence action filed by Galarza under the Federal Tort Claims Act. The central issue before us here was never squarely raised there, and neither the Majority nor Galarza suggests that it was or should have been. Although the FTCA action was subsequently consolidated with this § 1983 action, presumably so that they could be before one judge, not two, it was separately treated and resolved. Thus, it is only in the most technical sense that one can say, as the Majority says at note 3, that the "U.S. Government," which it "doubt[s]" would disagree with its interpretation of § 287.7, was a "part[y] to this case" when the District Court articulated the principle before us on appeal.

2

are requests, not orders. *Id.* at 29. Of course, we don't know what the "federal government" would have argued—it was not in the case.

And the record before the District Court on the central issue before us was barebones. In this connection, it bears emphasis that that issue, i.e. whether or not detainers issued pursuant to § 287.7 impose a mandatory obligation to detain on state and local law enforcement agencies, was but one of numerous issues raised in the District Court against the various defendants and combinations of defendants. The District Court issued an extremely thoughtful and very thorough 56-page Opinion, with its finding as to the issue before us essentially tucked away in little more than one paragraph near the end, s*ee* JA 55-56, undoubtedly because there had been no emphasis on the issue in the District Court and little record made as to it.

In the face of all of this, the Majority, in a sweeping Opinion, has decided this enormously important issue. And it did not stop there. Rather, it went on to conclude that "[e]ven if there were any doubt about whether immigration detainers are requests and not mandatory orders," to read § 287.7 to mean that a federal detainer is a command to a law enforcement agency to detain an individual would violate the anti-commandeering principle of the Tenth Amendment. Maj. Op. at 17.

Maybe it would, and maybe it wouldn't, even assuming, with no great confidence, that the Tenth Amendment issue should have been reached. Galarza did, indeed, raise the issue in the District Court. The County, however, never offered a full-throated response on the merits, or lack thereof, of that issue, arguing instead that the constitutionality of § 287.7 should be litigated in another, more appropriate, case. Not unimportantly, the District Court did not in its lengthy Opinion even mention, much less decide, anything to do with the Tenth Amendment. *Very* importantly, the United States was not heard as to it.

All of this makes me very uncomfortable. Given the posture of the case before the District Court, I'm not sure how, if at all, the United States could have been brought in.

3

What I *am* sure of is that we have gone very far in this very important case without any input from the United States, and we should pull back now.  For now, though, I'm not prepared to say, on what has essentially been a one-sided presentation, that "shall" really doesn't mean "shall" but, instead, means "please."  I respectfully dissent.