RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0123p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JAMES PHILLIPS,

    *Plaintiff-Appellant,*

    *v.*

No. 14-6190

CHARLES R. MCCOLLOM, III,

    *Defendant,*

JOSEPH E. TERNES, JR., et al.,

    *Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 4:11-cv-00066—Joseph H. McKinley, Jr., Chief District Judge.

Decided and Filed:  June 12, 2015

Before:  SUTTON, GRIFFIN, and WHITE, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:**  Evan Taylor, Owensboro, Kentucky, for Appellant.  Ann Michelle Turner, TURNER, KEAL & DALLAS PLLC, Prospect, Kentucky, for Appellees.

_____

### OPINION

_____

SUTTON, Circuit Judge.  In 2005, the City of Henderson, Kentucky, raised its taxes. The resulting $500 tab was too dear for James Phillips, a certified public accountant and Henderson resident.  He assailed the tax hike before the city council, in the *Henderson Gleaner*, and in the course of advising his clients.  When Tax Day 2006 came around, Phillips did not pay

what he thought he should not owe. The city treated his civil disobedience as criminal misconduct. A Kentucky jury convicted Phillips of a misdemeanor for failure to file a return, but a state appellate court threw out the conviction. Phillips sued the city and its officials in federal court for violating his Fourteenth Amendment rights to procedural due process and equal protection. The district court rejected both claims as a matter of law. We affirm.

The 2005 tax law, still in effect today, requires "every person or business entity engaged in any business, trade, occupation, or profession" within Henderson's city limits to pay 1% of its previous year's net profits for the privilege of doing business there. Henderson, Ky., Code of Ordinances § 21-33(a). Each taxpayer must report his annual net profits on an "occupational license return." The net-profits calculation depends on information reported on various Internal Revenue Service forms. As a result, no taxpayer can report anything to the city without doing his federal taxes first. As another result of that feature of the law, the ordinance's filing deadlines and the IRS filing deadlines are identical. 26 U.S.C. § 6072(a); Code of Ordinances § 21-37(a).

The ordinance also creates a new agency: the Board of Occupational License Appeals. The Board is empowered to "render decisions on questions of interpretation of [the] ordinance, on questions of allocation of payroll and net profits, on proceedings of delinquent tax collections, and on the waiver of penalties assessed." Code of Ordinances § 21-43. Although the ordinance does not say how such appeals work, the city's assistant finance director described it this way:

> [T]he taxpayer would talk to my staff. If they disagreed with that, they would talk to me. If they still disagree, to my boss, up the chain of command to the City manager. If they still disagreed, then they would file some kind of written appeal that says "I don't agree with this interpretation."

R. 96-6 at 11. Henderson's Board of Commissioners has the power to review all Board decisions.

The ordinance backstops its reporting system with several penalties. On the civil side, it designates delinquent taxes as personal debts owed to the city and enforceable "by civil action," Code of Ordinances § 21-46(d), (e), and imposes steep penalties for failure to file and steeper penalties for failure to pay, *id.* § 21-46(a) to (c). On the criminal side, it creates a "class A misdemeanor" for "willful[] fail[ure] to make a return . . . with the intent to evade payment of the

tax or amount collected." *Id.* § 21-46(f). That crime operates not as an alternative but "[i]n addition to" the civil penalties the ordinance prescribes. *Id.*

The ordinance took effect on New Year's Day 2006. When Henderson's Finance Department tried to apply the law to its taxpayers' 2005 earnings, it ran into a problem. The federal tax code respects the difference between calendar-year filers (whose tax years end in December) and fiscal-year filers (whose tax years end in any month but December). Because the Henderson ordinance relies on information reported on IRS forms, it respects that difference too. But the tax it replaced—the one governing its taxpayers' *2004* earnings—did not respect that difference. The earlier tax calculated obligations using "gross receipts" from "January through December" of the previous year, no matter whether the taxpayer was a calendar-year or fiscal-year filer. R. 96-5 at 26–27.

For calendar-year filers, the transition from the old tax to the new tax did not present a problem. The old tax applied to gross receipts between January 1, 2004 and December 31, 2004, while the new tax applied to the profits reported on the taxpayer's federal return, which covered profits between January 1, 2005 and December 31, 2005. The same was not true for fiscal-year filers. Take a taxpayer whose fiscal year begins February 1 and ends January 31. In 2005, under the old system, he paid taxes on gross receipts between January 1, 2004 and December 31, 2004. (Just like his calendar-year counterpart.) In 2006, however, the new tax required him to pay taxes on the net profits reported on his *federal* return. Because federal returns take his fiscal-year status into consideration, the city could not capture all profits he earned during the 2005 calendar year by reference to one return alone. Using his 2005 return, which spanned February 2004 through January 2005, would have left eleven months of net profits untaxed: those earned between February 2005 and December 2005. (It would also have created a double-taxation problem by leaving him on the hook for net profits earned between February 2004 and December 2004—from which sum the city had already assessed eleven months' worth of tax.) Using his 2006 return, which spanned February 2005 through January 2006, would have left one month of net profits untaxed: those earned in January 2005. The city considered resolving this dilemma by "combin[ing] two tax returns" or by "do[ing] some type of prorating." R. 96-5 at 27. But those solutions created administrative difficulties of their own. Unable to come up with a

workable solution to the problem and doubtful there were many fiscal-year filers, the city decided to tax its fiscal-year taxpayers by reference to their 2006 returns alone. As a consequence, only calendar-year taxpayers were required to pay taxes on profits earned during every month in 2005.

That resolution irritated Phillips, a calendar-year taxpayer. A certified public accountant licensed to practice in Henderson, Phillips initially supported the city's tax hike. His views changed after he discovered that the city expected him to pay the new tax on his 2005 profits. As he read the law, its effective date meant it applied to his *2006* profits and onwards. The fact that the city planned to forgive fiscal-year filers' obligations on a portion of their 2005 profits added insult to injury.

Phillips criticized the ordinance in public meetings, private conferences, correspondence with city officials, and a letter to the editor of the *Henderson Gleaner*. He advised his clients to pay the new tax under protest. And when his own taxes came due (to the tune of $500), he did not even do that. He instead refused to file his occupational license return, prompting the city to charge him with a misdemeanor. When Phillips explained his actions to the county attorney, the attorney told him to "go ahead and file the return and just not pay it, because if you do that, that would be a civil matter and . . . the City will have to take . . . you to civil court." R. 96-4 at 21. Phillips declined the offer and threatened a lawsuit of his own. His truculence did not pay dividends. A state jury convicted him. Happily for Phillips, the Kentucky Court of Appeals reversed that judgment. *Phillips v. Commonwealth*, 324 S.W.3d 741 (Ky. Ct. App. 2010).

No longer content to play defense, Phillips sued the city and its officials in federal court for violations of federal and state law. He lost across the board in the district court. He appeals the resolution of two of those claims: a procedural due process claim, which the district court dismissed under Civil Rule 12(b)(6), and an equal protection claim, which the court rejected at summary judgment.

*Procedural Due Process.* No State may "deprive any person of life, liberty, or property" without "due process of law." U.S. Const. amend. XIV. To prevail on his due process claim, Phillips must do two things. He must show that the city and its officials deprived him of a "liberty or property interest." And he must show that they did so without "process"—without

according him the procedural protections the Federal Constitution requires. *See Sickles v. Campbell County*, 501 F.3d 726, 730 (6th Cir. 2007). His key problem is that he has suffered no loss of property (or for that matter liberty). Almost a decade has passed since his 2006 taxes came due, but the city has yet to receive a cent of that money because Phillips has yet to pay. Nor has the city tried to collect that debt by way of a civil action. Nor has the city revoked Phillips' license to practice as a certified public accountant. Nor did the criminal action succeed. Nor could a criminal action succeed in the future with respect to his 2006 taxes given the imperatives of the Double Jeopardy Clause in the United States Constitution. On this record, the city has not deprived Phillips of any constitutionally protected interest—a first prerequisite of a cognizable due process claim and a final answer to this claim.

Phillips protests that the city *did* deprive him of something: his interest in airing his grievances at a hearing before the Board of Occupational License Appeals. The ordinance establishing the new tax, he points out, required the City of Henderson to create the board and the city, he adds, never did. All true. But the Supreme Court has rejected the notion that an interest in process itself warrants process, holding that "an expectation of receiving process is not, without more," an "interest protected by the Due Process Clause." *Olim v. Wakinekona*, 461 U.S. 238, 250 n.12 (1983). "Process is not an end in itself" after all, but a means to protect other interests. *Id.* at 250. We have said the same thing in other settings. *See, e.g., United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir. 1992) (per curiam). To rule otherwise creates this tail-chasing dilemma: "If a right to a hearing is a liberty interest, and if due process accords the right to a hearing, then one has interpreted the Fourteenth Amendment to mean that the state may not deprive a person of a hearing without providing him with a hearing." *Levin v. Childers*, 101 F.3d 44, 46 (6th Cir. 1996) (per curiam) (quoting *Shango v. Jurich*, 681 F.2d 1091, 1101 (7th Cir. 1982)), *abrogated on other grounds as recognized by Johnson v. City of Detroit*, 446 F.3d 614, 627–28 (6th Cir. 2006). We have no interest in going down that road. In the final analysis, a cognizable due process claim requires the deprivation of a substantive liberty or property interest; a city's failure to provide process by itself does not suffice.

Phillips insists that, even if he did not have an interest in the creation of the board itself, he at least had an interest in the ability to petition that board before his misdemeanor

prosecution. That argument rests on the false premise that the board has authority over criminal prosecutions. In reality, the board's power extends only to civil collection actions; Kentucky's county attorneys retain sole control over the levers of criminal justice. *See* Ky. Rev. Stat. § 15.725(2). Nothing in the Federal Constitution requires States to pursue civil remedies as a prerequisite to criminal ones. *See Butler v. Elle*, 281 F.3d 1014, 1023 (9th Cir. 2002). The argument at any rate would fail even if the board *did* have authority over criminal prosecutions. A mere failure "to comply with state law does not . . . automatically translate into a deprivation of procedural due process under the United States Constitution." *DePiero v. City of Macedonia*, 180 F.3d 770, 788 (6th Cir. 1999).

*Equal Protection.* Phillips accuses the city of violating the Fourteenth Amendment's equal protection guarantee by exempting all fiscal-year filers from taxes on a portion of their 2005 profits while forcing all calendar-year filers to pay taxes on their 2005 profits in full. But the Federal Constitution does not prohibit all differential enforcement of municipal laws. *See Warren v. City of Athens*, 411 F.3d 697, 710–11 (6th Cir. 2005). So long as the city has not drawn its categories "along suspect lines," its classifications survive constitutional scrutiny "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012). Administrative convenience alone "can justify a tax-related distinction," as the Court made clear in *Armour*. *Id.* at 2081. There, the City of Indianapolis created a tax its citizens could pay in installments or in full. When the city later abandoned the tax, it forgave all outstanding obligations for its installment-paying taxpayers, but refused to refund any money it had collected from the thirty-eight taxpayers who had paid in full. *Id.* at 2079. Sufficiently rational, held the Court: "To have added refunds to forgiveness would have meant adding yet further administrative costs, namely the cost of processing refunds." *Id.* at 2081.

The City of Henderson faced a similar problem and handled it similarly. In the words of the city's assistant finance director, "[T]here were so few fiscal-year filers and I didn't think that the amount of money involved was that large, so we just didn't pursue that [class of taxpayers] for lack of time." R. 96-6 at 4. The city's actions satisfy the modest requirements of equal protection in this area.

Phillips claims that the city could have enforced the new tax against fiscal-year filers without much, if any, hassle. But rational basis review does not authorize us to substitute his views—or for that matter our views—for the city's views, so long as the city's views otherwise meet the slack minimums of rationality. Phillips adds that the city never made a reasoned decision to confer a benefit on fiscal-year filers because the record does not say *who* in its finance department signed off on that policy. As a factual matter, we do not see how his conclusion follows from his premise: Just because we do not know who authorized the policy does not mean that the city failed to debate it. As a legal matter, the argument is irrelevant: The city's actions do not violate the Equal Protection Clause so long as there is *any* plausible justification for them, supported by the record or not. *Heller v. Doe*, 509 U.S. 312, 320–21 (1993).

For these reasons, we affirm.