RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0157p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DR. LARRY CUNNINGHAM,

      *Plaintiff-Appellee* (21-6005),
      *Plaintiff-Appellant* (21-6174),

   *v.*

DAVID W. BLACKWELL, LARRY HOLLOWAY, and WILLIAM EUGENE THRO, individually,

      *Defendants-Appellants* (21-6005),
      *Defendants-Appellees* (21-6174).

> Nos. 21-6005/6174

DR. EHAB SHEHATA,

      *Plaintiff-Appellee* (21-6006),
      *Plaintiff-Appellant* (21-6172),

   *v.*

DAVID W. BLACKWELL, LARRY HOLLOWAY, and WILLIAM EUGENE THRO, individually,

      *Defendants-Appellants* (21-6006),
      *Defendants-Appellees* (21-6172).

> Nos. 21-6006/6172

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
Nos. 3:20-cv-00008 (Cunningham) and 3:20-cv-00012 (Shehata);
Gregory F. Van Tatenhove, District Judge.

Argued: June 29, 2022

Decided and Filed: July 18, 2022

Before: SUTTON, Chief Judge; BATCHELDER and DONALD, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Joe F. Childers, CHILDERS & BAXTER, PLLC, Lexington, Kentucky, for Plaintiffs. Bryan H. Beauman, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, for Defendants. **ON BRIEF:** Joe F. Childers, CHILDERS & BAXTER, PLLC, Lexington, Kentucky, for Plaintiffs. Bryan H. Beauman, Donald C. Morgan, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, William E. Thro, UNIVERSITY OF KENTUCKY, Lexington, Kentucky, for Defendants. Ronald G. London, FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, Washington, D.C., for Amicus Curiae in 21-6172.

SUTTON, C.J., delivered the opinion of the court in which BATCHELDER, J., joined, and DONALD, J., joined in part. DONALD, J. (pp. 19–23), delivered a separate opinion concurring in all but Parts III.A.1. and III.B.2. of the majority opinion.

---

**OPINION**

---

SUTTON, Chief Judge. The University of Kentucky investigated two dentistry professors for entering false data about whether they, or their students, had performed services for patients at a university clinic and whether they, or the clinic, should be paid for those services. While the investigation proceeded, the provost barred the professors from seeing patients in the clinic but allowed them to perform their other duties. After the investigation ended, both professors left the University. The professors sued, alleging the University violated their rights to due process under the Fourteenth Amendment and retaliated against them in violation of their rights to free speech under the First Amendment. Because the administrators did not violate clearly established law, qualified immunity protects them from each claim.

I.

Doctor Larry Cunningham and Doctor Ehab Shehata worked at the University of Kentucky's College of Dentistry. Cunningham began teaching at the College in 2001, and he had tenure. Shehata began teaching at the College in 2013, and he did not have tenure. Both professors worked at the College's clinic for oral and maxillofacial surgery.

On top of their salaries as professors, Cunningham and Shehata received pay for their clinical work. If one of them cared for a patient, the clinic designated him as the treating provider, and he would receive 40% of the collectible income. If a dental resident or hygienist provided care, he or she was the treating provider. In that case, the College kept all of the money. In 2018, Cunningham received roughly $176,100 in salary and $203,900 for clinical work. That same year, Shehata earned roughly $132,000 in salary and $199,400 in clinical income.

In 2017, Stephanos Kyrkanides, the Dean of the College, changed how the billing office determined who served as the treating provider. The new system labeled the author of the patient notes in the medical records as the treating provider. This created a problem for Cunningham and Shehata, who regularly allowed student residents to draft the notes. Without seeking permission from the administration, they circumvented the new system by copying patient notes that the residents drafted, pasted them under their own names, and deleted the original records. That way, the system would show that Cunningham or Shehata served as the treating provider, and they would receive their 40% share. Cunningham used this workaround 24 times, Shehata 110 times. No other professors did this, and only a later audit of the records revealed what had happened.

In their defense, the professors say that they acted as the treating providers in each case, and merely allowed the residents to draft the notes to give them a chance to practice their documentation skills. Because the professors provided the care, they claim, any manipulation of the records did not make them inaccurate.

Right or wrong, the compliance office saw things differently. They learned of the practice in February 2018. Software logs confirmed it. Brett Short, the University's Chief Compliance Officer, grew concerned that Cunningham and Shehata manipulated the data for profit and exposed the University to potential liability by faking medical records and falsely reporting who had done the work and who should be paid for it. He told them to stop "immediately." CR.62-10 at 23. Short's office investigated and retained an accounting firm to audit the records. After the February meeting, the professors stopped copying and pasting the notes and started writing the notes themselves.

In October 2018, Short briefly met with Cunningham and Shehata to inform them he was almost done with his investigation and asked if they had any more information to provide. Short emailed each of them the next day to offer an opportunity to respond to the investigation "in writing." CR.92-22 at 2; SR.107-22 at 1. Neither professor responded to the substance of the allegations.

On January 16, 2019, Provost David Blackwell removed Kyrkanides, and Doctor Larry Holloway stepped in as Interim Dean.

The next day, Blackwell and Short met with Cunningham to tell him that the University would start dismissal proceedings unless he resigned. Cunningham asked if he could wait until June. Blackwell told Cunningham that he could remain there until June but that he could not see clinic patients in the interim.

Shehata's meeting followed. Blackwell asked Shehata several questions and gave him a chance to explain his position. While Blackwell entered the meeting with the expectation of firing Shehata, he hesitated after hearing Shehata's side of the story, especially after it "became apparent" to him that Shehata "may have been influenced toward the deleting, cutting, and pasting by" Cunningham. CR.62-2 at 51. Blackwell told Shehata not to work in the clinic until the investigation finished.

While the suspensions prevented the professors from earning clinic income, they still received their base salaries. Cunningham retained his other academic, research, and administrative obligations, and Shehata published research papers, met with students, and administered exams.

Within a few weeks of his meeting with Blackwell, Cunningham wrote to the University's General Counsel, William Thro, explaining why he revised the records. In March 2019, the parties met and unsuccessfully attempted to resolve the situation. Blackwell initiated dismissal proceedings against Cunningham in May. Cunningham resigned on June 7. In July, he began a new position as the chair of oral and maxillofacial surgery and associate dean of hospital affairs at the School of Dental Medicine at the University of Pittsburgh.

Shehata, meanwhile, sent a letter to Blackwell explaining his actions. In June, Shehata and Blackwell met again, along with Holloway. After the meeting, Blackwell renewed Shehata's teaching contract but continued to prevent him from doing clinical work. Holloway signed Shehata's contract on July 2, 2019.

After Shehata and the College agreed to the new contract, Thro offered to allow him to resume clinical duties if he satisfied certain terms. Foremost among the terms, Thro required that Shehata admit that he "intentionally altered patient notes which resulted in false documentation being submitted to third-party payors." SR.1-2 at 55. Shehata refused. In September 2019, Thro informed him that his employment would end nine months later on June 30, 2020. One week after leaving the University, Shehata began working as an assistant professor and predoctoral program director at the School of Dentistry at the University of Maryland at Baltimore.

Shehata and Cunningham sued the University and various administrators, including Blackwell, Holloway, and Thro. Each raised a slew of federal and state law claims, including due process claims under the Fourteenth Amendment and retaliation claims under the First and Fourteenth Amendments.

The parties filed cross-motions for summary judgment. The district court, as an initial matter, allowed the professors' state law claims for breach of contract and wage-and-hour violations to proceed as well as a defamation claim by Cunningham against Blackwell. *See* Ky. Rev. Stat. §§ 45A.245, 337. Those claims are not at issue in this appeal.

The district court separately permitted the professors' due process claims regarding the suspension of their clinical duties to proceed, finding genuine issues of material fact and denying qualified immunity to Blackwell, Holloway, and Thro. It rejected as a matter of law three other federal claims: a due process claim by Shehata about the timing of his departure, a free speech claim by Cunningham that administrators retaliated against him for giving testimony in another case against the dean, and a free speech claim by Shehata that the administrators did not renew his contract because he refused to sign the sworn statement.

II.

Blackwell, Holloway, and Thro appeal the denial of qualified immunity on the professors' due process claims regarding suspension of their clinical duties.  The two professors cross-appeal the other three federal rulings.  We have jurisdiction over each set of appeals.

Precedent settles our authority to review denials of qualified immunity.  *Leary v. Livingston County*, 528 F.3d 438, 441–42 (6th Cir. 2008).  While the professors worry about our authority to review factual disputes about the record, that problem does not arise today.  The second prong of qualified immunity—clearly established law—does not implicate any such jurisdictional question.  The clearly established inquiry does not turn on what happened in the case; it turns on the existing law in the area.  As the parties agree, the administrators may raise this legal question in an interlocutory appeal.  *Id.*

As for the other three federal decisions, the district court certified its rulings as final judgments under Civil Rule 54(b), which permits us to review the rulings.  *See* 28 U.S.C. § 1291.

III.

All of the federal claims against the administrators of this public university are subject to the twin pillars of a qualified immunity defense:  (1) that the administrators violated the professors' constitutional rights and (2) that they violated clearly established law in doing so.  *Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 438 (6th Cir. 2013).  Absent a "beyond debate" showing that the administrators acted unconstitutionally, they receive immunity.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  We may resolve a qualified immunity defense under the first or second prong, as there is no "rigid order of battle."  *Pearson v. Callahan*, 555 U.S. 223, 234 (2009) (quotation omitted).  In today's case, the due process and free speech claims both fail to satisfy the second prong, the violation of clearly established rights.

A.

*Due process*.  The Fourteenth Amendment to the U.S. Constitution protects a person against the deprivation of "life, liberty, or property" without "due process of law."  U.S. Const. amend. XIV.  To apply, the guarantee requires the claimant to have a protected property interest.

*Phillips v. McCollom*, 788 F.3d 650, 653 (6th Cir. 2015).  If so, the question becomes whether the state actors provided adequate process.  *Id.*  The answer turns on three factors:  the government's interest, the individual's stake in the matter, and the suitability of the procedures.  *Gilbert v. Homar*, 520 U.S. 924, 931–32 (1997).

This "flexible" inquiry is more standard than rule, more guidance than formula.  *Id.* at 930 (quotation omitted).  Different circumstances call for different processes.  While notice and an opportunity to be heard remain the hallmarks of due process, they need not necessarily arrive before the deprivation does.  *Id.*  While "some kind of a hearing" generally must occur before the State fires a tenured employee, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 & n.7 (1985), the same is not true for other discipline.  When the State imposes a lighter penalty, such as a suspension, a post-deprivation hearing or a combination of pre- and post-deprivation safeguards may suffice.  *Gilbert*, 520 U.S. at 932; *Ramsey v. Bd. of Educ. of Whitley Cnty.*, 844 F.2d 1268, 1273–74 (6th Cir. 1988).

1.

Even if we assume for the sake of argument that the professors had a property interest in their clinical duties, the College administrators did not violate any clearly established due process right when they suspended the professors from working in the clinic and allowed them to continue working in their other roles.  Consider the circumstances facing the administrators.  Cunningham and Shehata stood accused of manipulating medical data in a highly regulated environment, one in which a misstep, to say nothing of fraud, could create serious liability for the College and University.  Instead of firing the professors, the administrators customized the suspensions to the problem at hand:  the professors' work in the clinics.  The professors received their base salaries and continued with their other duties.  A partial suspension pending further investigation in this setting does not strike a disinterested eye as unfounded or unfair.

Layer on top of that the pre-deprivation safeguards the administrators provided.  The suspension followed on the heels of an eight-month review, which included gathering digital evidence, holding interviews, obtaining an internal report from the compliance office, and inviting an external report from an accounting firm.  Compliance Officer Short heard the

professors' accounts and offered them a chance to respond in writing. From the outset, he emphasized that the situation was serious and listened to the professors' concerns. In their meetings with Blackwell, both Cunningham and Shehata asked him to delay any dismissal proceedings, and he did just that. *See Kaplan v. Univ. of Louisville*, 10 F.4th 569, 583 (6th Cir. 2021) (noting that claimant obtained relief on some of the grounds raised).

Post-deprivation procedures reduced the risk of error further. After the professors heard the allegations in full in the January 2019 meetings, they sent detailed letters and pages of evidence to the University's General Counsel, William Thro. Cunningham and the administrators reviewed the case in more detail in March. As a backstop, Cunningham enjoyed the protections of the University's rigorous dismissal proceedings for tenured professors, which provided more assurance that the truth would come out. Shehata for his part met with the administrators again in June. He explained his actions, and Blackwell responded by renewing his contract for a year. The administrators, it is true, extended his suspension in the clinic, but Shehata got to say his piece and kept his job and salary of approximately $132,000.

To put all of this in the language of legal doctrine, the government's interest was substantial, the impact on the professors was real but less serious than a true dismissal, and the administrators employed reasonably rigorous procedures. We cannot say that the administrators clearly provided inadequate process. The professors, notably, do not offer a single case establishing otherwise.

The responses they do offer do not sway us.

Cunningham and Shehata challenge the substance of the College's interest. The delay between the discovery of their conduct in February 2018 and their suspension in January 2019, they say, proves that the administrators did not need to bar them from seeing patients. But good-faith process considerations led to the delay, and it helped them in the end. Blackwell wanted to complete a full review, and he thought that waiting until Kyrkanides departed would make the process less partial. We are aware of no case establishing that he struck an impermissible balance. The calculus also changed when Blackwell showed Cunningham the door and told Shehata that his job hung by a thread. Had the public learned that the College allowed professors

to provide medical services when they planned to fire one and actively investigated the other, that could have undermined confidence in the dentistry clinic. *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 240–41 (1988). The professors offer no precedent undercutting these interests. To the contrary, the cases support their validity. *See Gilbert*, 520 U.S. at 932–33 (noting the state interest in preserving the "integrity" of the subject of investigation and the relevant institution).

Cunningham and Shehata emphasize the significance of their interest in performing clinical work. No doubt, the uncertainty was stressful and costly. But the question on the table at this point is not whether they had a legitimate interest. It is whether their interest was so substantial that it demanded more process than they received. An unpaid temporary suspension requires less process than a discharge. *Id.* at 932. It follows that a partial suspension with partial pay requires less process, particularly when they remained professors with full base salaries. Even then, ample pre- and post-deprivation measures remained in place. No case to our knowledge, or theirs, sets a higher constitutional floor.

Next, the professors object to the procedures used. They identify four other possible safeguards. But the Constitution does not clearly require any of them.

The professors, to start, maintain that our cases clearly establish their right to pre-deprivation notice of the charges and the evidence against them as well as a pre-deprivation hearing. But the Supreme Court has assiduously avoided insisting on pre-deprivation process, especially for suspended employees as opposed to fired ones. *Loudermill*, 470 U.S. at 542 n.7; *Gilbert*, 520 U.S. at 930–31; *see Kaplan*, 10 F.4th at 581–84 (holding that a tenured professor did not suffer a due process violation when the University put him on paid leave while it investigated him without providing a pre-deprivation hearing); *Williams v. Kentucky*, 24 F.3d 1526, 1539–41 (6th Cir. 1994) (holding that *Loudermill* did not establish that a tenured public employee has a due process right to a hearing before a demotion). The cases invoked by the professors involve employment terminations, not partial reductions. *Loudermill*, 470 U.S. at 535–36; *Buckner v. City of Highland Park*, 901 F.2d 491, 493 (6th Cir. 1990); *Lane v. City of Pickerington*, 588 F. App'x 456, 458 (6th Cir. 2014). And the special stakes associated with dismissal play a central role in the underlying reasoning. *Loudermill*, 470 U.S. at 543.

Even if we could look the other way on the distinction between a termination and a suspension, these cases do not help the professors on their own terms. They do not require a "full adversarial evidentiary hearing," only "an initial check against mistaken decisions." *Id.* at 545. In *Buckner*, for example, we found that a detective received sufficient pre-termination notice when union officials visited him while he was in the hospital and disclosed the charges against him. 901 F.2d at 495. And we found that he had an adequate opportunity to be heard before he was fired because a lieutenant went to the hospital and asked him to comment on the charges, which he declined to do. *Id.* Here, the administrators could reasonably conclude that, between the meetings Short conducted, the email he sent offering the professors a chance to respond, and the professors' opportunity to speak with Blackwell in January, the offered processes cleared this bar.

The professors, secondly, complain about lack of notice. They acknowledge that they knew about a "documentation concern." But they argue the administrators blindsided them with more severe claims of fraud. Any gap in knowledge about the claims, however, was less than they say and did not harm them anyway. They recognized that the allegations were serious enough for Short to escalate the investigation. The record confirms that, after meeting with Short, they understood the allegation that they billed for patients they never saw. Here, too, after-the-fact process supplemented the protections offered. After the January meetings, when Blackwell made the stakes clear, the professors sent detailed letters explaining what they did and why. They understood the allegations against them well enough to stress that they personally treated the patients whose notes they revised. By June 2019, Blackwell told Shehata he had no doubt that Shehata had "treated every single patient." SR.66-6 at 131. Yet throughout, the administrators continued to find suspension appropriate. The professors do not articulate what they might have done with earlier notice.

Cunningham and Shehata, thirdly, point out that the administrators did not promptly provide the compliance office's report or the falsified medical records. They argue that this led them to fear that other evidence existed. But here too they fail to explain how more process could have shifted the inquiry. They understood the factual allegations. They had an opportunity to respond in writing in October 2018. They followed up in their January 2019

letters. Any uncertainty about whether additional evidence existed did not prevent them from engaging with the allegations in their January 2019 letters. The administrators reasonably could conclude that the underlying evidence offered little incremental procedural value.

Cunningham and Shehata, fourthly, say that their post-deprivation process came too late. But they sent letters within weeks and had follow-up meetings with the administrators within a few months of the revocation of their clinical duties. Without more, it is difficult to maintain that a few months' delay became constitutionally dilatory. *See Loudermill*, 470 U.S. at 547 (upholding nine-month delay in providing post-deprivation adjudication).

The dissent offers three other reasons of its own to question the procedures the administrators used: the informality of the proceedings, the lack of an opportunity to call witnesses, and the partiality of the decisionmakers. At the threshold, the professors' failure to mention these points suggests that they probably do not think that resolving the alleged deficiencies would have made the proceedings any fairer. In any event, the Due Process Clause did not clearly require the administrators to proceed differently.

Start with the informal nature of the meetings. It is function, not formality, that guides our analysis. *See Buckner*, 901 F.2d at 495 ("While the charges against him were not formally presented, Buckner knew the gist of the allegations against him.").

Second, the dissent objects that the administrators should have given the professors the chance to call witnesses. The professors have not explained which witnesses they would have called and for what purpose. Without specifics, we cannot conclude that these additional safeguards would have offered "probable value" relative to the procedures used. *Gilbert*, 520 U.S. at 931 (quotation omitted).

As a third offensive, the dissent questions the administrators' neutrality, noting that they ultimately continued to bar the professors from clinical duties and played a role at earlier stages of the proceedings. But we cannot evaluate an adjudicator's impartiality based on the result he reaches. That would overlook the procedural nature of this claim. And the administrators' ongoing involvement does not clearly establish unfitness. No one, least of all the professors, has identified a case holding that a totally uninvolved adjudicator must oversee the proceedings that

follow a suspension.  To the contrary, "[m]ere familiarity with the facts of a case" or taking "a position, even in public, on a policy issue related to the dispute" does not disqualify a decisionmaker without a specific showing of bias.  *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976); *see Newsome v. Batavia Loc. Sch. Dist.*, 842 F.2d 920, 926–27 (6th Cir. 1988); *Riggins v. Goodman*, 572 F.3d 1101, 1111–13 (10th Cir. 2009).  No such showing exists here.

Finally, the dissent faults us for asking the professors to do too much to overcome qualified immunity.  But we do not demand a case on all fours, only one with enough overlap to place the constitutional question beyond dispute.  Due process is flexible and fact intensive. *Cafeteria & Rest. Workers Union, Loc. 473 v. McElroy*, 367 U.S. 886, 895 (1961).  The more discretion a constitutional guarantee gives a state actor, the less likely it will be clearly violated in a case without similar facts.  *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam). We have no such case here, and the professors have not otherwise placed the unconstitutionality of the administrators' conduct "beyond debate."  *Id.* at 1152 (quotation omitted).

2.

Cunningham separately seeks relief for constructive discharge—that the suspension made his job so miserable that it forced him to resign.  But this claim fails as a matter of law for many of the same reasons as the last one.

Assume, as Cunningham claims, that the administrators constructively discharged him when they barred him from the clinic.  Assume further that they are not entitled to qualified immunity on that question.  Even still, they are entitled to qualified immunity on the question of whether they provided adequate process.  The constructive-discharge theory does not upend the conclusion that a reasonable official could conclude that the procedures used adequately accounted for the public and private interests at stake.

True enough, characterizing these events as a constructive discharge might require us to reconsider Cunningham's interests.  A constructive discharge after all differs from a suspension, and for some purposes a constructive discharge equals an actual discharge.  *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004).  But that's not clearly the case here.  The impact on

Cunningham remained less severe than if the University had fired him outright in January. He continued to make money and perform several duties for five months. That delay gave him a chance to negotiate further. And it gave him time to find a new job.

Viewing this case through a constructive discharge lens, moreover, casts the College's process in a better light. Cunningham resigned in June 2019. All of the process he received up to that date thus counts. Even if his departure were akin to a firing and even if *Loudermill* applied, the University provided far more than the "initial" pre-deprivation "check against mistaken decisions" that *Loudermill* requires. 470 U.S. at 545–46. Yes, Cunningham says that the University discharged him in January, not June. But saying it does not make it so. A constructive discharge does not occur until the employee resigns. *Green v. Brennan*, 578 U.S. 547, 555 (2016). Cunningham offers no case to the contrary, and we highly doubt any such case exists.

3.

What of Shehata's claim that the administrators unconstitutionally ended his appointment early? Because they gave him nine months' notice and because his contract provided for twelve months' notice, he claims, a due process violation arose on this independent basis.

The administrators are entitled to qualified immunity on this claim, too, largely for the reasons described above. Shehata had ample opportunity to explain himself, whether in the meetings with Short in 2018, the meeting with Blackwell and Short in January 2019, the memorandum he sent to Blackwell after the January meeting, or the meeting with Blackwell and Holloway in June 2019. In objecting that he should have received more specifics about the charges against him and the medical records he purportedly faked, he does not show how this information would have reduced the risk of error.

Nothing about this conclusion, by the way, undermines Shehata's claim that he had a contractual right to work after June 2020. The district court granted summary judgment in his favor on his breach of contract claim against the University on this ground. The point is that, even if he does have a protected interest as the court's summary-judgment ruling suggests, that does not speak to the process provided.

Shehata claims that he had a more significant interest in his overall employment than he did in his clinical duties alone. Perhaps that is true in the abstract. But it is hardly self-evident that a deprivation of three months of work is more severe than an indefinite deprivation of clinical duties. All of the process Shehata received in connection with the suspension of his clinical duties in any event preceded the decision not to renew his contract. As with Cunningham's constructive discharge claim, so with this one: Even if the claim includes the deprivation of a more serious interest, it involves more robust pre-deprivation procedures over a longer time.

B.

*Free speech*. As to the First Amendment claims, Cunningham and Shehata raise distinct theories of retaliation but must run a common gauntlet. Four showings in all stand in their path. Each professor must establish that he engaged in activity the First Amendment protects. *Stockdale v. Helper*, 979 F.3d 498, 506 (6th Cir. 2020). Each must show that he suffered an "adverse action," *id.*, one that would dissuade "individuals of ordinary firmness" from doing "what they were doing," *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337 (6th Cir. 2010) (quotation omitted). Each must show that a causal link connects their First Amendment activity and the administrators' adverse actions. *Stockdale*, 979 F.3d at 506. And each must show that any violation turned on clearly established law. *Id.*

1.

Cunningham claims that the administrators targeted him because he sat for a deposition in the *Mullins* lawsuit against Kyrkanides and offered testimony that supported the plaintiff's claim. *See Mullins v. Kyrkanides*, No. 5:17-CV-319, 2018 WL 4688727 (E.D. Ky. Sept. 28, 2018). But he stumbles over causation. A First Amendment retaliation plaintiff must establish that the employer acted "in response to" his protected activity. *Stockdale*, 979 F.3d at 506. Cunningham must make the factual showing that the administrators would not have acted against him if he had declined to sit for the deposition. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).

Cunningham has not introduced evidence that would permit a jury to make that finding. He sat for the deposition in May 2018. That fell in the middle of these events. The investigation

into Cunningham's conduct began in February 2018 and predated the deposition. His January 2019 suspension postdated the deposition by eight months. And dismissal proceedings began a full year later, in May 2019. Nothing connects the documentation scandal and the *Mullins* lawsuit except that Cunningham happened to be involved in each.

Cunningham resists. He argues that the fraud allegations were pretextual, pointing to evidence suggesting that the administrators initially thought the claims against him were unfounded and claiming they baselessly reversed course only months later. But that does not do justice to the record. While the evidence says that in September 2018 Blackwell described the compliance report as "skimpy" and said that the University's President wanted him "to dig a little deeper," CR.62-1 at 120–21, Blackwell in fact kept digging. That the administrators ultimately found the charges worth pursuing does not establish that they pursued charges for a different reason, let alone a constitutionally prohibited reason.

Cunningham contends as well that the administrators' divergent treatment of Shehata establishes that they punished Cunningham more severely because of his deposition. But Blackwell entered the January 2019 meetings planning to fire them both. Cunningham convinced Blackwell to allow him to resign much later. Shehata convinced Blackwell to investigate further. Negotiations proceeded separately, and the men made their own choices from there. Differences in circumstances readily explain these differences in treatment.

In his reply brief, Cunningham auditions a distinct divergent-treatment argument, contending in a sentence that the University has responded to other documentation issues by educating or training faculty members, not suspending them. But the naked assertion that other providers have entered incorrect data does not show—without any evidentiary data backing it up—that they have anything else in common with Cunningham. He has not established a genuine dispute about whether the administrators imposed disparate discipline.

Cunningham, finally, reaches for timing, noting that the suspension occurred soon after the *Mullins* case settled for roughly half a million dollars. But Cunningham must point to more than just timing. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006). The timing checks out in any event. Blackwell explained that he waited to suspend Cunningham

until after he removed Kyrkanides as dean because he feared that bad blood between the two men would infect proceedings against Cunningham. No reasonable juror could review this evidence and conclude an eight-months-stale deposition clearly caused the suspension.

2.

Shehata's retaliation claim asserts that his contract was not renewed because he did not comply with the administrators' demand to admit that he "intentionally altered patient notes which resulted in false documentation being submitted to third-party payors." SR.1-2 at 55. But this claim falters from the start. His refusal did not indisputably qualify as protected activity.

No clearly established law supports the claim. The courts of appeals have arrived at different answers to the question of whether the First Amendment allows an employer to require an employee to sign his name to a statement he believes is false as part of his job duties. The Second Circuit has taken the position that the First Amendment can step in. *Jackler v. Byrne*, 658 F.3d 225, 229, 231–32 (2d Cir. 2011) (holding that a former police officer's refusal to submit a report with which he disagrees qualifies as protected activity for First Amendment purposes). The D.C. and Seventh Circuits have gone the other way. *Bowie v. Maddox*, 642 F.3d 1122, 1127, 1134 (D.C. Cir. 2011) (holding that a former employee did not enjoy First Amendment protection when he refused to sign an affidavit containing "misstatements of fact" and "language that would convey impressions that he would not agree with" about a former colleague (quotation omitted)); *Davis v. City of Chicago*, 889 F.3d 842, 846 (7th Cir. 2018) (holding that the First Amendment did not protect an employee's right to refuse to publish reports reaching conclusions with which he disagreed). Our Court to date has stayed out of the fray. *Kingsley v. Brundige*, 513 F. App'x 492, 499 (6th Cir. 2013).

This collective uncertainty on prong one of qualified immunity creates certainty on prong two. If the circuits disagree and if our circuit has yet to take a stand, the law remains unsettled. *Cagle v. Gilley*, 957 F.2d 1347, 1349 (6th Cir. 1992). That reality precludes Shehata from establishing he clearly engaged in protected activity.

In our dissenting colleague's view, the split between the circuits does not swallow this case because admitting to a crime fell outside the scope of Shehata's professional duties.

We cannot agree, at least not with certainty that puts the question "beyond debate." *Ashcroft*, 563 U.S. at 741. A reasonable official could conclude that acknowledging past misdeeds qualified as a job responsibility. Shehata's job required him to enter medical records accurately. The clinic manager taught him to use the software when he started. After investigating Shehata's documentation practices, the administrators imposed conditions on his return to the clinic. They asked him to complete training about billing documentation. And they asked him to admit that he intentionally altered records in a manner that caused the submission of false documentation to third parties. Those are simply requirements that help ensure that he would not deviate from clinic policy again. If he cannot admit that what he did before was wrong, who is to say he would not repeat it?

That Shehata believes that admitting to the administrators' version of events amounts to confessing to a crime does not clearly change the analysis, at least under the First Amendment. Indeed, the key authorities the dissent invokes on that point concern the Fifth Amendment, not the First. And whether or not the Self-Incrimination Clause prohibited Shehata's firing, he brought no claim under the Fifth Amendment. *See Bowie v. Maddox*, 653 F.3d 45, 48 (D.C. Cir. 2011) (denying rehearing) ("[T]he illegality of a government employer's order does not necessarily mean the employee has a cause of action *under the First Amendment* when he contravenes that order.").

Shehata for his part focuses on the law that clearly establishes that a public employee's free speech rights encompass the right not to speak. But those cases simply do not deal with the issue at hand. He relies primarily on *Conn v. Deskins*, 238 F. Supp. 3d 924 (E.D. Ky. 2017), in which a road foreman alleged that county officials fired him for refusing to voice public support for the passage of an occupational tax while he was off the clock. *Id.* at 932–33; *Conn v. Deskins*, 199 F. Supp. 3d 1172, 1173 (E.D. Ky. 2016). Shehata, by contrast, refused to admit to on-the-job misconduct as a condition of returning to his old responsibilities. There is a world of difference for First Amendment, again as opposed to Fifth Amendment, purposes between speech in connection with an internal investigation and speech in connection with one's free time. Any comparison between the two cases gives analogy a bad name—and certainly not a good enough name to establish the law of the circuit on the point at hand.

For these reasons, we reverse the district court's decision denying summary judgment to the administrators on the professors' due process claims involving the suspension of their clinical duties and Cunningham's constructive discharge.    We affirm the district court's decision granting summary judgment to the administrators on Shehata's due process claim involving the early end to his appointment.  We affirm the district court's decision granting summary judgment to the administrators on the professors' First Amendment retaliation claims.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

BERNICE BOUIE DONALD, Circuit Judge, dissenting in part and concurring in part. Courts, including the majority here, too often apply a "rigid gloss on the qualified immunity standard," requiring plaintiffs to ferret out virtually identical circumstances arising in the purview of their circuit and resulting in a controlling decision with sufficiently detailed guidance. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). But the standard is not nearly that onerous. We have repeatedly rejected the notion that "the very action in question [be] previously . . . held unlawful," *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001), that a case be "directly on point," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), or that a case be "on all fours in order to form the basis for the clearly established right," *Burgess v. Fischer*, 735 F.3d 462, 474 (6th Cir. 2013). To do so would lead judges "to demand a degree of certainty at once unnecessarily high and likely to beget much wrangling." *United States v. Lanier*, 520 U.S. 259, 270 (1997).

Instead, the proper inquiry is whether, at the time of the challenged conduct, "the contours of a right [were] sufficiently clear" such that every "reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741. The Supreme Court has long held that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question" such that "officials can be on notice that their conduct violates established law *even in novel factual situations*." *Hope*, 536 U.S. at 741 (emphasis added) (internal quotations omitted) (citing *United States v. Lanier*, 520 U.S. 259 (1997)). The dispositive question thus boils down to whether the state of the law gave the defendants "fair warning" that their actions were unconstitutional. *Id.*

It is with these principles in mind that I dissent from Parts III.A.1. and III.B.2. of the majority opinion.

I.

Although this case presents a slight variation to the customary discipline of public university professors—suspension of essential job duties versus suspension of all job duties—it does so against a surplus of fundamental constitutional rules with obvious implications.

For more than 150 years "the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard. . . .'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quoting *Baldwin v. Hale*, 68 U.S. 223, 233 (1863)). "It is equally fundamental that the right to . . . an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). When protected interests are implicated, "due process requires a 'neutral and detached judge in the first instance.'" *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 617 (1993) (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 62 (1972)). "These essential constitutional promises may not be eroded[,]" *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004), or "balanced away," *Hicks v. Commissioner of Social Security*, 909 F.3d 786, 797 (6th Cir. 2018).

Such baseline procedural protections extend to discipline of public employees short of termination, albeit with lesser force. In cases not involving termination, pre-deprivation procedures may give way to post-deprivation procedures with adequate procedural safeguards. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 n.7 (1985); *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). "But there is no dispute that *never* providing an opportunity to challenge a [deprivation of property] violates due process." *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 488 (6th Cir. 2014) (emphasis in original) (internal citations omitted). When faced with a temporary suspension without pay, a public employee must receive a "sufficiently prompt postsuspension hearing." *Gilbert,* 520 U.S. at 932.

In this case, the University Defendants informally met with Drs. Cunningham and Shehata, notified them of the general allegations against them, and gave them a chance to orally explain their side of the story. At the conclusion of the meeting, the University Defendants decided to delay termination proceedings but forbid the professors from performing any clinical

activities. Fearing a loss of income and clinical faculty status, the professors retained legal counsel and informal settlement negotiations ensued. Over the next several weeks, the professors' counsel drafted letters explaining why they engaged in the copy-delete-paste practice. The majority relies heavily on these "detailed letters explaining what they did and why" and the "follow-up meetings with the administrators" to find the post-deprivation process sufficient.

But those informal settlement negotiations cannot amount to the type of post-deprivation process owed. The University Defendants negotiated with the sleight of hand. Drs. Cunningham and Shehata knew of the general fraud allegations against them, but they never received any supporting evidence. Their counsel was left to negotiate without the internal investigation report; the external auditor report; the resident interviews; or the allegedly falsified medical records with the patients treated, dates of service, and treatment provided. In addition, counsel had access only to the University Defendants and never had the opportunity to call witnesses or offer competing evidence to a neutral decisionmaker. It cannot be said that defending oneself to the Provost, Dean, and opposing counsel—the parties responsible for the suspensions and eventual discharges—constitutes a meaningful opportunity to be heard.

It is beyond debate that failing to provide, at a minimum, a post-deprivation hearing before a neutral decisionmaker violates the due process clause. This is especially true given that Provost Blackwell ultimately believed Dr. Shehata had "treated every single patient" and yet still continued to blacklist him from all clinical activities for another year. The majority's decision to the contrary renders the Fourteenth Amendment's procedural due process guarantees hollow. For that reason, I respectfully dissent from Part III.A.1.

II.

The same rings true for the University Defendants' alleged retaliation against Dr. Shehata. Our case law gives fair warning that "public employees may not be required to sacrifice their First Amendment free speech rights in order to obtain or continue their employment . . . ." *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2004) (quoting *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003)). And it is well settled that "[t]he free speech rights of a public employee . . . include the right to refrain from speaking." *Langford v. Lane*, 921 F.2d

677, 680 (6th Cir. 1991). Thus, it has been clearly established for over thirty years that a public employee cannot be compelled to speak.

The majority narrowly construes the matter to ask whether Dr. Shehata had a clearly established right to refuse to submit a false statement pursuant to his official duties. It is true that the University's Compliance Program Manual required all healthcare employees "within 24 hours of discovery, to report any misconduct that they, in good faith believe is potentially illegal, unethical, abusive, or otherwise not in adherence with the spirit or intent of UKHC's [Corporate Compliance Program]." However, the University Defendants requested not only that Dr. Shehata confirm whether Dr. Cunningham influenced him to engage in "wrongful behaviors" or "told him to 'keep quiet' about the false documentation," but also that he admit to the elements of healthcare fraud.[1]

There is an insurmountable difference between reporting employee misconduct and confessing to a crime. Certainly, a forced admission to a crime is not "ordinarily within the scope of an employee's duties" as a clinical professor; it does not "owe [its] existence" to the responsibilities of a public employee. *Kennedy v. Bremerton School Dist.*, No. 21-418, ___ U.S. ___, 2022 WL 2295034, at *11 (June 27, 2022) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). To require a public employee to submit a sworn incriminating statement goes beyond internal personnel misconduct and implicates private speech—speech that indisputably constitutes an improper basis on which to terminate a public employee. *See generally Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) (holding that it is unconstitutional to terminate a public employee solely for asserting the privilege against self-incrimination); *see also Buckner v. City of Highland Park*, 901 F.2d 491, 496 (6th Cir. 1990) (holding that a public employer cannot discharge an employee solely due to an invocation of the right against self-incrimination). Thus, no reasonable public employer could have concluded that it was constitutionally permissible to hinge Dr. Shehata's continued employment on his compelled admission to a criminal act. For that reason, I also respectfully dissent from Part III.B.2.

---

[1]In particular, the University Defendants requested that Dr. Shehata execute "a sworn statement, with sufficient detail to satisfy the University, which he . . . admits he intentionally altered patient notes which resulted in false documentation being submitted to third-party payors[.]"

III.

Based on the foregoing, I would affirm the district court's denial of summary judgment on the procedural due process claims and reverse the district court's grant of summary judgment on Dr. Shehata's First Amendment retaliation claim. I concur with the majority in all other respects.